**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ATEF A. ELZEFTAWY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-06971 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| PERNIX GROUP, INC. a Delaware | ) | |
| Corporation, and DOES 1-100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In November 2016, Atef Elzeftawy sustained serious injuries to his left leg and foot while working at a construction site for his employer, Pernix Group, Inc., a construction company headquartered in Lombard, Illinois. *See* R. 1, Compl. at 4, 13.[1][2] Nearly two years later, Elzeftawy brought this lawsuit against Pernix, alleging a cornucopia of federal and state claims. More specifically, he alleges violations of the following federal statutes: the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (Count 1); Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count 2); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count 3); and the False Claims Act, 31 U.S.C. § 3730(h) (Count 5), as well as 42 U.S.C. § 1981 (Count 4). Elzeftawy also alleges violations of multiple California statutes: the Family Rights Act (CFRA), Cal. Gov't Code § 12945.1 *et seq.* (Count 6); the Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12940 *et seq.*

---

[1]The Court has federal question jurisdiction over this case under 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

[2]Citations to the record are noted as "R." followed by the docket number.

(Counts 7-11); the California Labor Code, Cal. Lab. Code §§ 6310 and 6400 (Count 12) and § 1102.5 (Count 14); the False Claims Act, Cal. Gov.'t Code § 12653(a) (Count 13); and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (Count 19). In addition, Elzeftawy brings California common-law claims for fraud (Counts 16-18), and for wrongful adverse employment action in violation of California public policy (Count 15).

If there is any way of making sure that a case gets off to a slow start, it is to plead a prolix 102-page, 173-paragraph complaint, as Elzeftawy did. Not at all surprisingly, Pernix has filed a motion to dismiss Counts 16-18 for lack of particularity under Federal Rule of Civil Procedure 9(b), as well as all 19 counts for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3] R. 23-1, Mot. Dismiss. For the reasons discussed below, Pernix's motion is granted in part and denied in part.[4]

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), as well as those in

[3]Pernix also purports to seek dismissal of Count 19 of the Complaint for lack of subject matter jurisdiction under Rule 12(b)(1), R. 23-1, Def.'s Mot. Dismiss at 1, but Pernix's brief completely fails to develop this argument, *see* R. 23-2. In any event, given that the Court has federal-question jurisdiction over Elzeftawy's FMLA, ADA, Title VII, and other federal claims, the Court may also exercise supplemental jurisdiction over Count 19, which is a California state-law claim. *See* 28 U.S.C. § 1367.

[4]Elzeftawy argues that the Court should refuse to consider most of the arguments in the motion to dismiss, complaining that the motion covers many more issues than Pernix had raised at the meet-and-confer. R. 26, Pl.'s Resp. Br. at 1. But Elzeftawy is asking for far too much. Considering the unnecessary density of the Complaint, and the myriad trivial and superfluous arguments in it, the defense can hardly be blamed for not spending hours conferring over all 19 counts. That said, the Court urges *both* parties to focus and streamline their arguments moving forward in order to avoid wasting any more time.

Elzeftawy's response brief (to the extent they are consistent with the Complaint), *see Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017). *See also Thompson v. Ill. Dep't of Prof. Reg.*, 300 F.3d 750, 753 (7th Cir. 2002) (on a Rule 12(b)(6) motion, the pleadings "consist generally of the complaint, any exhibits attached thereto, and supporting briefs.") (citing Fed. R. Civ. P. 10(c)).

Elzeftawy, an Egyptian-American and Muslim resident of California, started working for Pernix in 2012. *See, e.g.*, Compl. at 9, 12. At the time of the alleged injury, Elzeftawy was working on a construction project in South Korea as Senior Director of Engineering and Special Projects. *See* R. 26-1, Pl.'s Resp. Br., Exh. 2, 1/30/18 EEOC Charge at 9;[5] *id.* at Exh. 3, 4/10/18 EEOC Charge at 18; Compl. at 9-10. Elzeftawy had recently been promoted to this position after years of "award winning service"— including an award from the U.S. Government for Best Design and Efficiency—and after bringing in over $100 million dollars in business for Pernix from federal government contracts. Compl. at 9-10.

In the summer and fall of 2016, just a few months before he was injured, Elzeftawy and other employees complained about safety issues at the company to Nidal Zayed (Pernix Group's CEO and President) and to Ed McSweeney (President of Pernix General, as well as Elzeftawy's supervisor). *See* Compl. at 12; *see also id.* at 14, 62. The safety hazards included lack of adequate warning signs in dangerous construction zones. *Id.* at 12. But these complaints apparently went unheard, because

---

[5]Page citations to R. 26-1 (the exhibits to Elzeftawy's response brief) and R. 23-4 (some of the exhibits to Pernix's opening brief) are to the PDF pagination because neither document has an internal page-numbering scheme.

in November 2016, Elzeftawy accidentally stepped onto open, raised steel floor tiles full of electrical conduits, sustaining a broken fibula, chipped ankle joint, and shattered heel bone. *Id.* at 13. As a result, he was totally disabled from November 2016 to January 2017 and needed multiple surgeries, which he underwent in his home state of California (presumably returning there at some point shortly after the injury). *See id.* That December, Candace Watson—Pernix's Human Resources Director—informed Elzeftawy that he was entitled to 12 weeks of FMLA leave, after which he would get either his previous job back or a similar one. *Id.* at 12-13.

In early January 2017, Elzeftawy's health-care providers cleared him to return to work (though just for desk duty and no travel). *See* Compl. at 14. He immediately told Zayed and McSweeney that he wanted to come back to work. *Id.* Shortly after, Elzeftawy's doctors cleared him for travel, so he then informed Pernix in January and February 2017 (as well as continuously afterward) that he was willing to move anywhere in the world for a position. *Id.* at 23. In fact, according to Elzeftawy, he was qualified for several open positions, including desk jobs like Senior Civil Estimator and Planning and Scheduling Analyst, as well as field jobs like Project Manager and Site Civil Engineer. *Id.* at 30. Pernix knew about his qualifications, including his decades of experience in various engineering-related positions (such as logistics, purchasing, project control, and others), as well as the nature and extent of his job duties as Senior Director of Engineering and Special Projects, from the FMLA forms

he filled out and submitted in December 2016. *Id.* at 14. Despite this, Pernix never gave him his old job back nor offered him any other position. *Id.* at 20.

Instead, Elzeftawy claims that McSweeney told him there were no positions available for him in January 2017, which was allegedly a lie. Compl. at 22. Then, when Elzeftawy emailed Zayed to follow-up, Zayed responded that although they had considered a "place for [Elzeftawy] on Maputo[,]"the "feeling" was that they did not have a spot for Elzeftawy there "at present." *Id.* Apparently, while McSweeney gave Elzeftawy the cold shoulder and "stone-walled" him, Zayed (and HR Director Watson) promised him that they were trying to find him a position. *Id.* at 24. But according to Elzeftawy, they were just pretending, because they never offered him anything, not even when he sent them various resumes or asked them about open positions that he had found on his own. *Id.* at 24-25. Although there was a glimmer of hope in May 2017, when Pernix proposed a Consulting Agreement with the promise that they would continue to look for a more permanent position, Zayed ultimately nixed the idea. *Id.* at 26. And in September 2017, when Elzeftawy expressed interest in an open position that Zayed's brother (who was the Director of Corporate and Marketing Services) had told him about, no one ever responded to the inquiry. *Id.* In fact, Pernix requested an exit interview with Elzeftawy the following month—something that is ordinarily done when an employee leaves a company. *Id.* Although it is unclear whether Elzeftawy went through with the exit interview, he does allege that, to this day, no one has ever informed him whether he was actually discharged. *Id.* So his

5

employment status has essentially been in a state of limbo since his injury in November 2016.

According to Elzeftawy, Pernix's conduct, including its failure to provide him with a position (or to even make a good faith effort to *try* and find him a position), constituted discrimination on the basis of his disability, race, color, national origin, ancestry, and religion. Compl. at 4. For one, Elzeftawy alleges that McSweeney would get angry at employees who got hurt on the job or who were otherwise disabled, especially because that would require Pernix to comply with federal and state laws like the FMLA and the California Family Rights Act. *Id.* at 22. Also, Elzeftawy learned in summer 2016 that Zayed and McSweeney had decided to lower the number of Muslim employees at Pernix, believing that it would make the company more competitive when bidding for U.S. government contracts. *Id.* at 10. Elzeftawy allegedly opposed this decision (although it is not clear how he did so or to whom). *Id.* What's more, Elzeftawy also alleges that McSweeney made racist and derogatory comments about Muslims and Middle-Easterners, including by equating them with terrorists. *Id.* at 10, 20. And given that McSweeney allegedly went on racist "rants" about Middle-Easterners, this apparently happened more than once. *Id.* at 31. Elzeftawy complained about these statements too, including in June or July 2016, when he "openly and forcefully chid[ed]" McSweeney for being offensive and racist. *Id.* at 21. Although it is not clear at this point what Zayed and McSweeney said (if anything) in response to these complaints, Elzeftawy alleges that Caucasian and non-Muslim employees who became disabled received better treatment, including

6

reasonable work accommodations for their disabilities. *Id.* at 23. In fact, despite Elzeftawy's repeated requests to return to work, Pernix allegedly filled various positions with non-disabled, non-Muslim, non-Egyptian-American employees who were *less* qualified than Elzeftawy (and who had not complained about any harassment or discrimination). *Id.* at 28.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[6] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

"must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

That said, fraud claims must meet a more demanding standard than other claims. Claims alleging fraud must set forth more than just "a short and plain statement"; they must satisfy the heightened pleading requirements of Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). That is, Rule 9(b) generally requires plaintiffs to "state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (cleaned up). This heightened pleading standard applies to both federal and state fraud claims. *See, e.g.*, *Cornielsen v. Infinium Capital Mgm't, LLC*, 916 F.3d 589, 604 (7th Cir. 2019).

### III. Analysis

### A. Federal-Law Claims

### 1. The Family Medical Leave Act (Count 1)

### a. Employee Eligibility

First, Elzeftawy alleges that Pernix retaliated against him for requesting leave under the Family Medical Leave Act, and interfered with his rights under the Act more generally, including by refusing to rehire him. Compl. at 39-40. To state any

claim under the FMLA, a plaintiff must be eligible for FMLA protection in the first place. *See, e.g.*, *Pagel v. TIN, Inc.*, 695 F.3d 622, 627 (7th Cir. 2012). To be eligible under the FMLA, an employee must have worked for their employer for at least 12 months and for at least 1,250 hours during the previous 12-month period. 29 U.S.C. § 2611(2)(A). The Act explicitly excludes from coverage individuals who were employed at a worksite with fewer than 50 employees (if the total number of employees within 75 miles of the worksite was also under 50). *Id.* at § 2611(2)(B)(ii). Here, because Elzeftawy has failed to adequately allege that he was an "eligible employee," his FMLA claims must be dismissed.

To start, Elzeftawy alleges only that he was *entitled* to an FMLA leave, *see, e.g.*, Compl. at 10, 13, 15, but it is well-established that entitlement to medical leave and eligibility as an employee are two separate things. *Compare* 29 U.S.C. § 2611(2) (defining "eligible employee"), *with id.* at § 2612(a)(1) (stating the requirements that eligible employees must meet to be entitled to leave). *See also Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008) ("To prevail on … [an] FMLA interference claim, [a plaintiff] must establish" both that they were eligible "for the FMLA's protections" *and* "entitled to leave under the FMLA"). Although district courts have disagreed on how much *detail* a plaintiff must allege about eligibility, "it is plain that some kind of allegation to that effect is needed in order to raise a plaintiff's entitlement to relief beyond a speculative level." *Gilliam v. Joint Logistics Managers, Inc.*, 2017 WL 758459, at *2 (C.D. Ill. Feb. 27, 2017) (collecting cases). But Elzeftawy alleges nothing of the sort. Even viewing the facts in his favor, there is

nothing to suggest that he met the hours requirement (or that Pernix employed 50 or more employees within 75 miles of his worksite). Sure, Elzeftawy started working at Pernix in 2012, which satisfies the 12-month requirement, but that alone does not raise a reasonable inference of eligibility.

### b. Extraterritorial Reach of the FMLA

Pernix also argues that the FMLA claims should be dismissed because the statute does not apply extraterritorially to Elzeftawy's employment in South Korea. R. 23-2, Def.'s Br. at 3-4. In response, Elzeftawy contends that there is nothing in the Complaint saying that he worked in South Korea—the implication being that he is not actually asking for an extraterritorial application of the FMLA, so the Court should not even reach that question. Pl.'s Resp. Br. at 6-7. But even though it is true that the location of his employment is nowhere to be found in the Complaint, Elzeftawy's *own exhibits* in response to Pernix's motion say that he was working in South Korea in November 2016. *See* 1/30/18 EEOC Charge at 1; 4/8/18 EEOC Charge at 16. *Cf. Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 505 (7th Cir. 2013) (courts may consider and form their own conclusions "as to the effect of [an] exhibit" attached to the complaint) (cleaned up). Plus, Elzeftawy later concedes in his brief that he worked "in California before going to Korea[.]" Pl.'s Resp. Br. at 29. And the Complaint actually hints at this, alleging that Elzeftawy "was willing to move or travel anywhere in the world for his work (*as he previously had done for* [Pernix])."

Compl. at 23 (emphasis added). So the Court must address whether the FMLA applies extraterritorially.

Although neither the Supreme Court nor the Seventh Circuit has determined whether the FMLA applies extraterritorially, it is well-established that when "a statute gives no clear indication of an extraterritorial application, it has none," reflecting the "presumption that United States law governs domestically but does not rule the world[.]" *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013) (cleaned up). Nothing in the FMLA overcomes that presumption: there is nothing in the text of the statute to suggest that it covers employment outside the United States, so the presumption against extraterritoriality applies in full force. *See Souryal v. Torres Advanced Enter. Sols., LLC*, 847 F. Supp. 2d 835, 841-43 (E.D. Va. 2012) (because FMLA does not apply extraterritorially, it could not reach claims related to employment at U.S. Embassy in Iraq). Moreover, the federal labor regulations that apply to the FMLA also say that the law "applies only to employees who are employed within any State of the United States, the District of Columbia or any Territory or possession of the United States. Employees who are employed outside these areas are not counted for purposes of determining employer coverage or employee eligibility." 29 C.F.R. § 825.105(b).[7] *See also* 29 U.S.C. § 2654 (providing that "[t]he Secretary of Labor shall prescribe such regulations as are necessary to carry out" the FMLA).

It is also worth noting that there is no reason to think that the phrase "employed within" in section 825.105(b) of the regulations is referring to the place

---

[7] "[W]hen Congress expressly delegates the authority to an agency to promulgate regulations implementing a particular statutory provision, the agency's regulations are

from which the *employer* made decisions about medical leave. Rather, the ordinary meaning of the term "in" refers to the employee's *physical* work location. Also, in context, the regulation also excludes extra-territorial work sites by using the language "employed outside these *areas*." 29 C.F.R. § 825.105(b) (emphasis added). Indeed, this interpretation is supported by the text of the FMLA itself. As mentioned earlier, the FMLA excludes "any employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). This provision, too, uses the word "employed" to refer to the location at which the employee performs work—and there is no reason to think that the applicable regulation defines it any differently.

Based on the statutory and regulatory text, Elzeftawy has essentially pleaded himself out of court on his FMLA claims by conceding that he was working on a project in South Korea in November 2016. It is true that Elzeftawy alleges that he has been a California resident since July 2015, Compl. at 4, but the FMLA is not concerned with residency, just with *employment*. Indeed, by alleging in his response brief that he had worked for Pernix in California before going to Korea, Elzeftawy

---

entitled to more than mere deference or weight ... [they are] entitled to legislative effect." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (cleaned up). *See also Tony and Susan Alama Found. v. Secretary of Labor*, 471 U.S. 291, 296-97 (1985) (noting that the Department of Labor's regulations construing the Fair Labor Standards Act are "entitled to considerable weight"); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984) ("If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

has indicated that he was *not* employed in California when he was injured (in other words, when his alleged entitlement to FMLA leave would have been triggered). In short, even giving Elzeftawy the benefit of all reasonable inferences, his allegations permit only an inference that he was employed in South Korea—anything else on these facts would be impermissibly speculative. As a result, the FMLA does not authorize his claims.

Against this, Elzeftawy argues that Pernix is equitably estopped from raising an ineligibility defense. He contends that Pernix should not be allowed to assert now that he is not eligible for FMLA protection—not when it had told him way back in 2016 that he *was* eligible for and entitled to FMLA leave. *See* Pl.'s Resp. Br. at 7. As the Seventh Circuit explained in *Dormeyer v. Comerica Bank-Illinois*, "an employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of entitlement to family leave." 223 F.3d 579, 582 (7th Cir. 2000). *See also Collins v. Midwest Med. Records Ass'n*, 2007 WL 7166826, at *2 (E.D. Wis. Oct. 5, 2007) ("Equitable estoppel in the context of an FMLA claim has been applied in numerous cases where the employer's conduct has caused an employee to justifiably and detrimentally rely on the employer's representation as to the availability of FMLA leave.") (citing *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 724-27 (2d Cir. 2001), *Woodford v. Cmty. Action of Greene Cty., Inc.*, 268 F.3d 51, 57 (2d Cir. 2001), and *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 493-94 (8th Cir. 2002)). But even assuming that

equitable estoppel can somehow make the extraterritorial application of the FMLA permissible (as opposed to just preventing Pernix from asserting a defense of ineligibility), Elzeftawy has not adequately alleged the elements of the doctrine.

Generally, equitable estoppel requires a plaintiff to plausibly allege the following three elements: "(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on that misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *See United States v. Anaya-Aguirre*, 704 F.3d 514, 519 (7th Cir. 2013) (cleaned up). Here, although Elzeftawy adequately alleges that HR Director Watson informed him that he was entitled to FMLA leave and that he then relied on these representations, he has failed to plausibly allege that his reliance was reasonable. *See* Compl. at 13-14. Just the opposite, in fact. According to Elzeftawy, Watson's "admission … [was] contrary to [Pernix's] written policies (that ha[ve] continuously existed since 2008), which indicated that FMLA was 'inapplicable' to [Pernix] and its employees … ." *Id.* at 13. Given the written policies, even if there is such a thing as an FMLA claim for equitable estoppel (as distinct from a state law claim for estoppel), the complaint does not adequately allege facts to support it.

For all these reasons, Count 1 of Elzeftawy's Complaint must be dismissed. But this dismissal is without prejudice for now, to give Elzeftawy a chance to

plausibly (and in good faith) allege that he was somehow actually employed in the United States,[8] and that he was otherwise eligible for FMLA protection.

## 2. Title I of the ADA (Count 2)

Elzeftawy also brings a number of claims against Pernix under the ADA. "The ADA is designed to prohibit discrimination against employees whose disabilities have no bearing on their ability to perform a given job, but also to ensure employment opportunities for disabled persons who are otherwise qualified for a job, but as a

_____

[8]Because the caselaw on the extraterritorial effects of the FMLA is so sparse, and because the statute itself is silent on the issue, it is not clear how the FMLA would apply to an employee who physically works *both* in the United States and abroad. (Although there is nothing yet to suggest that this is the situation here, it is worth discussing in light of the possibility of an amended complaint.) For example, what if an employee (1) worked principally in the United States, (2) frequently traveled to, say, France for business, (3) got injured while working in France, and (4) subsequently filed an FMLA claim against the United States employer? It would seem that the FMLA *would* reach such a claim. For one, and even though it does not govern *extraterritoriality*, the 50-employee numerosity requirement (for purposes of employee eligibility) provides some guidance. Section 825.111 of the FMLA regulations explains that "[a]n employee's worksite under FMLA will ordinarily be the site the employee reports to or, if none, from which the employee's work is assigned." 29 C.F.R. § 825.111(a). And for "employees with no fixed worksite … the worksite is the site to which they are assigned as their home base, from which their work is assigned, or to which they report." *Id.* at § 825.111(a)(2). The regulation further clarifies that "when an employee is jointly employed by two or more employers … the employee's worksite is the primary employer's office from which the employee is assigned or reports, unless the employee has physically worked for at least one year at a facility of a secondary employer, in which case the employee's worksite is that location." *Id.* at § 825.111(a)(3).

Together, these regulations suggest that an individual's employment for purposes of the numerosity requirement depends on where they were physically reported to *most of the time* ("the site the employee reports to"). Only if they had no fixed location, or if they had a secondary employer, could their worksite be defined by the location from which their work is assigned (the location of their supervisors, presumably). There is no apparent reason why Congress would define location for purposes of extraterritoriality any differently from the geographic requirements for employee eligibility. In fact, given that one of the stated purposes of the FMLA is "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity[,]" 29 U.S.C. § 2601(b)(1), it is unlikely that the national interests in preserving family integrity, stability, and economic security would be served if the FMLA did not reach the claims of employees who were primarily employed (and thus, physically present most of the time), in the United States.

result of a disability are unable [to] perform the job's essential functions without reasonable accommodations." *Brumfield v. City of Chi.*, 735 F.3d 619, 632 (7th Cir. 2013) (cleaned up). Here, Elzeftawy alleges that Pernix violated the ADA by discriminating against him on the basis of his disability, failing to engage in an interactive process with him to determine a reasonable accommodation, refusing to provide him with a reasonable accommodation, subjecting him to a hostile work environment on the basis of his disability, and retaliating against him for asserting his rights under the ADA. *See* Compl. at 42. Pernix argues that *all* of Elzeftawy's ADA claims are untimely; that Elzeftawy's ADA claim for reasonable accommodation falls outside the scope of the EEOC charge; and that Elzeftawy failed to adequately plead certain elements of the reasonable accommodation, disparate treatment, and retaliation claims. Def.'s Br. at 15-20. The Court will address each of Pernix's arguments in turn.

### a. Timeliness of ADA Claims

Starting with timeliness, the ADA adopts Title VII's procedures in requiring, before an employee files a lawsuit, that the employee first file a timely administrative charge with the EEOC and then receive a right-to-sue notice from the EEOC. *See* 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e–5); *E.E.O.C. v. Harris Chernin, Inc.*, 10 F.3d 1286, 1288 n.3 (7th Cir. 1993). *See also Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 849 n.3 (7th Cir. 2019) ("The ADA incorporates by reference the enforcement provisions of Title VII"). In Illinois (and in California, for that matter), the charge must be filed within 300 days of the alleged unlawful employment practice.

16

*See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 636 (7th Cir. 2004); *see also Josephs v. Pacific Bell*, 443 F.3d 1050, 1053-54 (9th Cir. 2006).

This timing requirement, however, is an affirmative defense. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009). Elzeftawy did not need to "anticipate and overcome affirmative defenses" in the Complaint. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (cleaned up). Here, though, given that both parties have submitted the relevant purported charges, the Court will go ahead and consider Pernix's timeliness defense (including on the Title VII claims, which will be discussed in the next section)—with the caveat that further factual development may be cause for reconsideration.

Pernix argues, based on a charge that Elzeftawy filed with the EEOC in May 2018, that the ADA claims should be dismissed because the charge was filed more than 300 days after the underlying conduct occurred. *See* R. 23-4, Def.'s Br., Exh. 2, 5/18/18 EEOC Charge at 4; *see also* Pl.'s Resp. Br. at 1, 9 (essentially conceding the authenticity of the May 2018 charge). The charge, which is stamped as "received" by the EEOC, states that "on or about December 1, 2016, [Elzeftawy] requested a reasonable accommodation" and that since that date, he has "not been allowed to return to work." 5/18/18 EEOC Charge at 4. Based on this, Pernix argues that Elzeftawy's reasonable accommodation claim is time-barred because the December 1, 2016 request—the date of the alleged unlawful employment practice, in Pernix's view—falls well outside the 300-day window. Def.'s Br. at 16. But Elzeftawy responds that the May 2018 charge was not the only charge he filed; he also filed a charge with

17

the EEOC on January 30, 2018. *See* Pl.'s Resp. Br. at 1, 9; 1/30/18 EEOC Charge. A copy of this purported January 2018 charge—consisting of a letter to the EEOC written by Elzeftawy—is attached to Elzeftawy's response brief (in addition to a declaration from his attorney affirming that the "verified" charge was filed before Elzeftawy retained counsel). *See* 1/30/18 EEOC Charge; R. 26-1, Pl.'s Resp. Br., McCarty Decl. ¶ 8.

In Pernix's view, though, the Court should decline to consider the January 2018 document. Pernix contends that Elzeftawy's attorney's declaration "obscures and complicates the sequence of events surrounding Plaintiff's purported submission of his EEOC charges to the proper administrative bodies[,]" and so "the authenticity of the EEOC charges … is unclear … ." R. 27, Def.'s Reply Br. at 10. Pernix, however, fails to explain not only how the declaration "obscures" the sequence of events, but also how that has *any* bearing on the authenticity of the document at this stage of the case. *Cf. Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 649-50 (E.D. Wis. 2014) (rejecting plaintiff's "conclusory and unsupported" allegation of inauthenticity as to defense exhibit attached to Rule 12(b)(6) motion). Because Pernix did not adequately develop this argument—which is probably meritless [9] anyway—it is forfeited.

Nevertheless, it is worth discussing the substantive question at hand: that is, whether Elzeftawy's exhibit containing a copy of the purported January 2018 charge

---

[9] In suggesting that the Court disregard Elzeftawy's exhibits, Pernix mistakenly relies on *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009), which held that the district court acted within its discretion when it considered documents attached by the defense (without converting the motion to dismiss into a summary judgment motion). The Seventh

may properly be considered in deciding Pernix's Rule 12(b)(6) motion. It is true that when documents outside the pleadings are presented on a motion to dismiss, the Court must generally treat the motion as one for summary judgment and all parties must then "be given a reasonable opportunity to present" all relevant materials. Fed. R. Civ. P. 12(d). But there is one exception: exhibits attached to the parties' briefs may be considered if such exhibits were "referred to" in the complaint and "central" to the plaintiff's claims. *See Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1249 (7th Cir. 1994); *see also Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("The concern is that, were it not for th[is] exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit."). Here, Elzeftawy alleges in the Complaint that he "exhausted his state and federal administrative remedies by timely filing an administrative complaint (and amended complaints) with the Equal Opportunity Commission (EEOC) and … receiving a Right to Sue letter from the EEOC within 90 days of filing this lawsuit … ." Compl. at 38. These allegations are enough of a "reference" to the January 2018 "charge," especially given that filing a timely charge with the EEOC is an affirmative defense that a plaintiff need not even plead. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 921 (7th Cir. 2007) ("Filing a timely charge

---

Circuit distinguished the facts in *Hecker* from those in *Travel Over the World v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1430 (7th Cir. 1996), where the Court held that a document outside the pleadings should *not* have been considered where the plaintiff contested its authenticity, and the district court failed to draw reasonable inferences in the plaintiff's favor. *See Hecker*, 556 F.3d at 582. Both *Hecker* and *Travel* are distinguishable from Elzeftawy's case because they concerned *defense* exhibits and thus, one of the primary issues was whether the court properly drew reasonable inferences in the plaintiffs' favor, as is required on a Rule 12(b)(6) motion.

with the EEOC is not a jurisdictional prerequisite to suit in federal court; rather, it is an affirmative defense akin to administrative exhaustion.") (citing *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982)). And there is no question that a document purporting to be a charge with the EEOC is central to Elzeftawy's ADA claims (and Title VII claims, as discussed below).

Having established that the exhibit may properly be considered, the Court must next determine whether the document could reasonably constitute a "charge" under the ADA. Generally, "a charge is sufficient when" the EEOC "receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of[,]" 29 C.F.R. § 1601.12, and when the statement could reasonably be construed as a request to the EEOC "to activate its machinery and remedial processes," *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (defining an EEOC "charge" under the ADEA). *See also Carlson v. Christian Bros. Servs.*, 840 F.3d 466, 468 (7th Cir. 2016) (relying on *Fed. Express Corp.*, 552 U.S. at 402 to define "charge" under the ADA). It is important to remember, though, that the ADA, like Title VII, "sets up a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process … [t]he system must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." *See Fed. Express Corp.*, 552 U.S. at 402-403 (cleaned up).

Here, Elzeftawy clearly sets out the identity of the parties in the January 30, 2018 letter by providing Pernix's name, as well as its Illinois address, a telephone

number, and the number of individuals it employs. 1/30/18 EEOC Charge at 9. He also alleges the misconduct with sufficient specificity, describing, for example, his injury (and when and where it occurred), his efforts to return to work, and Pernix's failure to provide him with a position, even though there were "dozens" of available jobs that he was qualified for and able to perform. *Id.* Moreover, the letter could plausibly be construed as authorizing the EEOC to commence an investigation and take remedial action. *See E.E.O.C. v. Union Pacific R.R. Co.*, 867 F.3d 843, 849 (7th Cir. 2017). Elzeftawy refers to the letter as a "charge" in the text itself, stating that he "want[s] this charge filed with both the EEOC and the State or local Agency … ." 1/30/18 EEOC Charge at 9. The letter also asserts that Elzeftawy "will cooperate fully with them in the processing of [his] charge in accordance with their procedures." *Id.* Looking at Elzeftawy's statements together, they could reasonably be construed as a request for the EEOC (as well as state and local agencies) to "activate [their] machinery and remedial processes[,]" *see Fed. Express Corp.*, 552 U.S. at 402— especially considering Elzeftawy was unrepresented at the time. *See Fugate v. Dolgencorp, LLC*, 555 Fed. App'x 600, 604-605 (7th Cir. 2014) (plaintiff's statement to EEOC investigator—5 days before statute of limitations expired, and having previously discussed the alleged misconduct—that she "wanted to proceed" with ADEA claims could reasonably be construed as a request for remedial action) (non-precedential disposition). Plus, at this stage of the litigation, there is nothing to suggest that the EEOC did *not* construe the January 2018 letter as a charge. *See Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1138 (7th Cir. 1994) (while "inaction

by the EEOC should not, for time limit purposes, bar an ADEA suit[,]" it is nevertheless "relevant that the EEOC treated the questionnaire as a charge"). For all these reasons, Elzeftawy's January 2018 letter to the EEOC constitutes a "charge" under the ADA (for now at least).

Circling back to the issue of timeliness, this means that Elzeftawy's ADA claims are limited to conduct that occurred on or after around April 5, 2017 (300 days before January 30, 2018). In other words, although Elzeftawy may present circumstantial evidence of pre-April 5, 2017 conduct to *support* the timely ADA claims, he may not *recover any damages* for pre-April 5, 2017 conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (a plaintiff-employee is not barred from "using … prior [time-barred] acts as background evidence in support of a timely claim."), *superseded in non-relevant part by statute*, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5 (2009).

### b. Scope of EEOC Charge – Reasonable Accommodation Claim

But Elzeftawy's ADA claims not only have to be timely, they also have to be within the scope of the allegations in the EEOC charge. Under the ADA, "a plaintiff filing suit in federal court may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *See Chaidez v. Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019) (cleaned up). "Claims are 'like or reasonably related' when (1) there is a reasonable relationship between the allegations in the charge and the claims in the complaint and (2) the claim in the complaint can reasonably be expected

to grow out of an EEOC investigation of the allegations in the charge." *Id.* (cleaned up). "The charge and complaint must, at minimum, describe the *same* conduct and implicate the *same individuals*." *Id.* (cleaned up) (emphases in original).

Here, Pernix argues that Elzeftawy's reasonable accommodation claim is outside the scope of the *May 2018* EEOC charge. Elzeftawy asks the Court to disregard this argument because Pernix neglected to provide or consider the *other* EEOC charges he filed (and in any event, he argues, this issue should wait until after discovery). *See* Pl.'s Resp. Br. at 8. But Elzeftawy's response never addresses—not even in the alternative—the *substance* of Pernix's arguments: that is, he never argues that the ADA claims fall within the scope of *any* of the purported charges. Normally, this would result in forfeiture. But on reply, Pernix *also* fails to advance any argument as to the scope of the January 2018 charge—even though Elzeftawy had attacked Pernix's initial failure to do so. What's more, Pernix also fails to address Elzeftawy's point regarding the need for discovery.

Having said all that, it is plain that the ADA claim for reasonable accommodation *does* fall within the scope of the January 2018 charge. The Complaint alleges that "within two months of [his] disabling injury … and continuing through the end of 2017, [Pernix] refused … to provide a reasonable accommodation, … refused to find and give him open positions, [and] lied to him about the lack of open positions and their purported attempts to find such … ." Compl. at 42. Elzeftawy also alleges that in January 2017, he was qualified and able to perform any number of available engineering-related desk jobs (and then later that month, jobs that required travel,

too), but Pernix refused to give him any of these positions, hiring less qualified, non-disabled individuals instead. *See id.* at 14, 41-42. Similarly, the January 2018 charge alleges that Elzeftawy was injured in November 2016; that Pernix "did nothing to put [him] back to work[,]" even though he was cleared for "office duty" and there were "dozens" of open positions that he was qualified to perform; and that Pernix discriminated against him on the basis of his disability, and failed to reasonably accommodate him and to engage in a timely, good faith interactive process with him. *See* 1/30/18 Charge at 9. So Elzeftawy's reasonable accommodation claim is "like or reasonably related" to the allegations in the January 2018 charge because it describes essentially the same parties and the same conduct: Pernix's alleged failure to provide Elzeftawy with a reasonable accommodation—in the form of a desk or office job (at least initially)—after he was injured in November 2016. *See Chaidez*, 937 F.3d at 1004. Put differently, the reasonable accommodation claim could reasonably be expected to grow from an EEOC investigation into the January 2018 charge. *Cf. id.* at 1005 n.3 (EEOC charges filed *pro se* are entitled to liberal construction).

It is also worth recognizing that the outcome would be the same even if Elzeftawy's January 2018 letter did *not* constitute a valid EEOC charge, and the analysis turned instead on the *May 2018* charge. On this, Pernix argues that (1) the Complaint fails to "corroborate" Elzeftawy's allegation in the May 2018 EEOC charge that he requested a reasonable accommodation on December 1, 2016, (2) that the EEOC charge does not describe the nature of the requested accommodation, and (3) the EEOC charge does not allege any other request for a reasonable accommodation.

24

*See* Def.'s Br. at 15-16. But a plaintiff "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (cleaned up). So whether the Complaint alleges that Elzeftawy requested a reasonable accommodation *exactly* on December 1, 2016 is largely irrelevant, because there is no requirement that the allegations in a complaint be identical to (or as detailed as) those in the underlying EEOC charge. *Compare, e.g.*, *E.E.O.C. v. Concentra Health Servs., Inc.*, 2006 WL 2024240, at *2-3 (N.D. Ill. July 12, 2006) (analyzing the more-detailed allegations in EEOC charge to determine whether plaintiff successfully stated retaliation claim under Title VII), *aff'd*, 496 F.3d 773 (7th Cir. 2007), *with Whitehead v. AM Int'l, Inc.*, 860 F. Supp. 1280, 1288-89 (N.D. Ill. 1994) (dismissing retaliatory discharge claim despite "detailed facts" in the complaint, because EEOC charge failed to "give rise to the slightest hint of a retaliatory discharge claim as alleged" in the complaint), *aff'd*, 99 F.3d 1142 (7th Cir. 1996). Rather, the question is simply whether the *claims* in the Complaint are like or reasonably related to the factual allegations in the EEOC charge; whether the EEOC charge contains more detail than the Complaint in some respects (or vice versa) does not change the analysis on scope.

That said, the May 2018 charge—which, unlike the January 2018 charge, was prepared by the EEOC and is on a standard form used by the agency—is sparse on details. It says that (1) Elzeftawy requested a reasonable accommodation in December 2016, but was not allowed to return to work, was not selected for available positions, and was eventually laid off, and (2) that Elzeftawy believed he was

discriminated against due to his disability, race, national origin, age, and religion. *See* 5/18/18 EEOC Charge. There is not even a mention of the disabling injury—though to be fair (and as will be discussed further in the next section), Elzeftawy suggests that the May 2018 charge incorporates additional allegations contained in a letter he sent to the EEOC in April 2018. But even considering the *form* May 2018 charge on its own, it describes essentially the same parties and the same conduct as the Complaint: Pernix's alleged discriminatory failure to provide Elzeftawy with a reasonable accommodation and to allow him to return to work. *See Chaidez*, 937 F.3d at 1004. The substance of the two documents is the same. Sure, the Complaint does suggest that Elzeftawy asked for an accommodation in *January 2017*, when he was cleared for desk duty, and not in December 2016 as alleged in the charge, but the two are still within the same very-short timeframe. In sum, there is no question that Elzeftawy's ADA claim for reasonable accommodation claim could reasonably be expected to grow out of an EEOC investigation into the May 2018 charge.

### c. Reasonable Accommodation

In addition to arguing that Elzeftawy failed to exhaust his administrative remedies, Pernix challenges the sufficiency of the allegations on the failure-to-accommodate claim. Generally, to state a failure-to-accommodate claim under the ADA, a plaintiff must adequately plead: (1) that they are a qualified individual with a disability; (2) their employer was aware of the disability; (3) and the employer failed to reasonably accommodate the disability. *See Brumfield*, 735 F.3d at 631. Here, Pernix does not dispute that Elzeftawy adequately alleged the first two elements. *See*

26

Def.'s Br. at 18-20. Instead, Pernix argues—unsuccessfully—that Elzeftawy's failure-to-accommodate claim should be dismissed because (1) he only lists "generalized job titles" and then merely "concludes" he was able to perform them, and (2) he never alleges that he told Pernix he could perform his *former* position with or without a reasonable accommodation. Def.'s Br. at 19.

Starting with the latter, Pernix's argument misunderstands the law on reasonable accommodations. The ADA generally defines a "qualified individual" with a disability as "'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires.*'" *Brumfield*, 735 F.3d at 631 (quoting 42 U.S.C. § 12111(8)) (emphasis added). Under the ADA, a reasonable accommodation possibly "includes reassignment to a vacant position for which the employee is qualified." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998) (citing 42 U.S.C. § 12111(9)(B)). So "[a] request as straightforward as asking for continued employment is a sufficient request for accommodation." *Id.* Contrary to Pernix's assertions, then, Elzeftawy does not have to plead that he is able to perform the duties of his former position (let alone plead that he told Pernix anything of the sort).

Similarly, Pernix's argument that Elzeftawy does not adequately describe the positions he *can* allegedly perform (or how he is able to perform them) also fails. According to Pernix, Elzeftawy should have included the "actual job functions or associated duties" of those positions. Def.'s Br. at 19. But Pernix has it all wrong. It is true that the Complaint lists, without much detail, several positions that were

allegedly open and that Elzeftawy could have performed even with his disability, such as "Planning and Scheduling Analyst" and "Senior Civil Estimator." *See* Compl. at 30. But these allegations are actually *more* detailed than they need to be. Given the other facts in the Complaint regarding (1) Elzeftawy's extensive past work experience, (2) the nature of his disability, and (3) his desire to return to work—as well as Pernix's knowledge of all these things—it would have been enough to allege *generally* that there were open positions that he qualified for, without specifying what they were. This would have been "sufficient notice to enable [Pernix] to begin to investigate and prepare a defense[,]" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1085 (7th Cir. 2008), especially considering that Pernix, as the employer, was in a much better position to know whether it had any vacancies (and whether any of those vacancies were "desk jobs" or were otherwise doable with Elzeftawy's restrictions).[10] But the Complaint does not stop there: by listing *specific* positions that were available, Elzeftawy gives Pernix more than enough notice of his failure-to-accommodate claim and the grounds upon which it rests.

Pernix also complains that Elzeftawy "bluntly concludes" that he was able to perform the various positions he listed, Def.'s Br. at 19, implying that he should have explained exactly *how* he could perform those positions with his disability. But the only caselaw Pernix cites in support of this argument is an unpublished decision from another district, discussing not the standard for pleading a failure-to-accommodate

---

[10]Indeed, under the ADA, it is the *employer's* duty to "ascertain whether he has some job that the employee might be able to fill" and to "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites." *Hendricks-Robinson*, 154 F.3d at 694.

claim under the ADA, but instead the standard for a *disparate treatment* claim on the basis of sex. *See id.* (quoting *Wade v. Morton Bldgs.*, 2010 WL 378508, at *6 (C.D. Ill. Jan. 27, 2010)). Putting aside that *Wade* is neither relevant to Elzeftawy's claims nor binding on this Court, the decision does articulate the following well-established principle: that a recitation of the *elements* of a claim cannot, on its own, support an inference of plausibility. *See Wade*, 2010 WL 378508, at *6. In other words, a plaintiff must allege more than mere legal conclusions to survive a motion to dismiss. *See, e.g.*, *Iqbal*, 556 U.S. at 678-79. Here, though, Elzeftawy's allegations that he was able to work as a Planning and Schedule Analyst (or any of the other jobs he identifies) is not a legal conclusion at all, but a *factual* statement concerning his physical capabilities at the time. And at the pleading stage, this fact must be accepted as true.

In short, all of Pernix's arguments against Elzeftawy's failure-to-accommodate claim fail, so the claim survives.

### d. ADA Disparate Treatment

Pernix also argues that the Complaint fails to state a plausible claim for disparate treatment under the ADA. Def.'s Br. at 16-18. A plaintiff bringing a disparate treatment claim (also known as intentional discrimination) under the ADA "must allege that he is disabled within the meaning of the Act, is nevertheless qualified to perform the essential functions of the job either with or without reasonable accommodation, and has suffered an adverse employment action because of his disability." *Tate v. SCR Med. Transp.*, 809 F.3d 343, 345 (7th Cir. 2015). On this claim, Pernix essentially argues that Elzeftawy fails to adequately plead that he

suffered an adverse employment action due to his disability. *See* Def.'s Br. at 17-18. The Court disagrees.

First, the Complaint adequately alleges an adverse employment action under the ADA. For purposes of disparate treatment, an adverse employment action generally "falls into one of three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Tarpley v. City Colls. of Chi.*, 752 Fed. App'x 336, 346-47 (7th Cir. 2018) (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011)) (cleaned up) (non-precedential disposition). So to qualify as "adverse," an employment action requires something more than a mere inconvenience or a change in job responsibilities. *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011). On this, Elzeftawy alleges that Pernix refused to place him in any position after he became disabled, effectively terminating his employment even though he was qualified and able to perform the essential functions of various open positions. *See, e.g.*, Compl. at 41-42. These facts support the inference that Elzeftawy suffered a *de facto* discharge—which is no doubt more serious than a small, inconvenient change in job responsibilities. What's more, the Complaint suggests that Elzeftawy stopped getting paid after December 2016 when his medical leave ended, Compl. at 14, which constitutes an adverse employment action even if he was technically still "employed" by Pernix. *See Alamo v. Bliss*, 864 F.3d 541, 553 (7th Cir.

2017) ("Diminishing an employee's compensation on the basis of national origin is an adverse employment action under Title VII."); *see also id.* (allegations that plaintiff was excessively detailed at work and "did not receive a salary or benefits … after his medical leave ran out" plausibly stated adverse employment action).

Pernix, however, seems to suggest that Elzeftawy could not have suffered an adverse employment action because he does not allege that he sought placement in any of the positions he lists in the Complaint, or that any of the positions were even available at the time of his "termination." *See* Def.'s Br. at 17. But as discussed above, Elzeftawy does not even need to identify any specific positions that he could have performed—it would have been enough had he alleged that Pernix effectively terminated his employment despite the availability of multiple positions throughout 2017 within his restrictions and qualifications. Under the federal notice-pleading regime, Elzeftawy is not required to allege additional details about when each position was available, nor how and when he sought placement for each one. In any event, though, the Complaint does allege—in the very same paragraph that lists examples of several open positions—that Elzeftawy "made it clear" to Pernix that he was willing to travel anywhere in the world for a job. Compl. at 30. And not only is it obvious that the list of positions is non-exhaustive, but Elzeftawy also alleges *repeatedly* that he continued to ask Pernix for a position, even telling them about a

few available positions that he had found on his own. *See, e.g.*, *id.* at 24-25. In other words, this argument is plainly wrong.

Having established that the Complaint plausibly alleges an adverse employment action, the next question is whether the facts plausibly suggest a connection between the adverse action and Elzeftawy's disability. The Complaint suggests that Pernix's allegedly discriminatory course of conduct began as early as January 2017—just two months after Elzeftawy was injured—when he asked to return to work to a "desk job" position. The Complaint also alleges that McSweeney had expressed anger in the past at disabled employees who got hurt on the job or who had serious health conditions that would then force the company to comply with disability laws. *See* Compl. at 22. Considering the temporal proximity between Elzeftawy's disabling injury and Pernix's actions, plus the circumstantial fact of McSweeney'sanimus towards disabled or injured workers, Elzeftawy has plausibly alleged that he was discriminated against due to his disability. *Cf. Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029 (7th Cir. 2013) (allegations that plaintiff's "supervisor chose not to remedy the situation because [the] supervisor and ... [the plaintiff's] co-worker were both males and her supervisor wanted to help him" adequately stated claim for sexual harassment).

According to Pernix, though, in order to adequately plead that he suffered an adverse employment action *because of* his disability, Elzeftawy must also allege that similarly situated employees without a disability were treated more favorably. Def.'s Br. at 16-18. But Pernix is wrong: the failure to allege similarly situated comparators

does not doom Elzeftawy's disparate treatment claim under the ADA. For one, pleading standards "are different from the evidentiary burden a plaintiff must subsequently meet" at trial or on summary judgment. *See Luevano*, 722 F.3d at 1028. So Elzeftawy may *eventually* choose to prove his disparate treatment claim using the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires, in part, evidence of similarly situated comparators. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). At the pleading stage, though, Elzeftawy does not need to allege facts to support a *prima facie* case of disability discrimination. *Luevano*, 722 F.3d at 1028 ("[U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case").

But because this issue may come up again on summary judgment, it is worth noting that the *McDougall Douglas* framework does not apply in every employment discrimination case, and plaintiffs may show discriminatory animus even in the absence of similarly situated comparators. *See Luevano*, 722 F.3d at 1028; *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1126-27 (7th Cir. 2006). Here, Pernix argues that Elzeftawy's ADA claim for disparate treatment is "completely undermine[d]" by his allegations that he had seen non-Muslims and non-Middle Easterners who had suffered work-related disabilities but who were not discriminated against. *See* Def.'s Br. at 18 (citing Compl. at 23). Aside from the fact that these allegations were made in the context of Elzeftawy's race, national origin, and religious discrimination claims, Pernix fails to recognize that sometimes "a plaintiff *cannot* identify similarly situated employees[,]" *Timmons*, 469 F.3d at 1126 (emphasis added). Indeed, it would

33

not be surprising if this was true for Elzeftawy's ADA claims; given the unique facts of this case, it might be difficult to find another employee who was "directly comparable to [Elzeftawy] in all material respects[,]" *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Luckily for Elzeftawy, though, he is not required to find such a comparator. The legal standard is simply whether "the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for it[,]" *Timmons*, 469 F.3d at 1126 (cleaned up), and there are many ways to make such a showing.

Ultimately, on the more relevant question of *pleading* standards, Elzeftawy has adequately stated a disparate treatment claim under the ADA.

### e. ADA Retaliation

In addition to prohibiting "employers from discriminating against qualified individuals due to a disability[,] ... the ADA also prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA ... ." *Rowlands v. United Parcel Serv. – Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018) (cleaned up). To state a retaliation claim under the ADA, Elzeftawy must allege that (1) he engaged in a statutorily protected activity, (2) he suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse action. *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). Although Pernix acknowledges that requesting a reasonable accommodation constitutes a protected activity under the ADA, it contends that there are no facts

connecting such a request with any adverse employment action. Def.'s Br. at 20. The Court disagrees.

Unlike the standard used in disparate treatment claims, an adverse employment action for purposes of a *retaliation* claim is simply one that would have dissuaded a reasonable worker from engaging in protected activities like filing a charge with the EEOC, requesting a reasonable accommodation, or otherwise opposing disability discrimination. *See, e.g.*, *Rowlands*, 901 F.3d at 798; *Lewis v. Wilkie*, 909 F.3d 858, 867 (7th Cir. 2018). *See also Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009) ("[T]he anti-retaliation provision of the ADA uses similar language to that in Title VII; thus, courts look to Title VII retaliation cases for guidance in deciding retaliation cases under the ADA.") (cleaned up).

Here, Elzeftawy essentially alleges that Pernix refused to let him return to work in retaliation for his requesting a reasonable accommodation, for "standing up for his rights concerning his disability," and for "opposing ... [Pernix's] illegal acts and omissions concerning [his] disability." *See* Compl. at 42. Although the latter allegation is much too vague—there is nothing to suggest, for example, that Elzeftawy complained to supervisors about McSweeney's angry comments regarding disabled workers—the Complaint obviously contains enough facts to support the inference that Elzeftawy repeatedly requested a reasonable accommodation. And there is no question that refusing to allow a disabled employee to return to work—even when they are qualified for multiple open positions—is the type of conduct that would dissuade a reasonable worker from requesting accommodations in the future,

or from engaging in other protected activity under the ADA. So Elzeftawy's retaliation claim under the ADA survives.[11]

To sum up, then: *all* of Elzeftawy's ADA claims survive—but only as to conduct occurring within the 300 days before January 30, 2018.

### 3. Title VII (Count 3)

Elzeftawy also brings claims under Title VII, which forbids employers from discriminating based on race, color, religion, sex, or national origin. *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing 42 U.S.C. § 2000e-2(a)). As previously mentioned, Title VII and the ADA share the same enforcement provisions, so in deferral states like Illinois, Title VII claims also require "a charge of employment discrimination [to have been] filed with the EEOC within 300 days of the alleged unlawful employment practice ... ." *Bass v. Joliet Public Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014). According to Elzeftawy, Pernix violated Title VII by discriminating against him and subjecting him to a hostile work environment due to his race, national origin, color, ancestry, and religion, and by retaliating against him for engaging in protected activity. *See* Compl. at 43-46.

### a. Timeliness

Once again, though, Pernix argues that Elzeftawy's Title VII claims are time-barred because the underlying alleged conduct occurred outside the limitations

---

[11]That said, Elzeftawy may want to consider whether he should proceed with this claim moving forward: because the Complaint does not identify an adverse employment action aside from Pernix's refusal to continue Elzeftawy's employment, the retaliation claim under the ADA might factually collapse with the failure-to-accommodate claim, thus adding unnecessary complexity to the case.

period. *See* Def.'s Br. at 7-8; Def.'s Reply Br. at 10. But the timeliness of the Title VII claims is not as easy to determine as Elzeftawy's ADA claims. First, the January 2018 charge makes no mention whatsoever of any misconduct based on race, national origin, color, ancestry, or religion. *See* 1/30/18 EEOC Charge. Elzeftawy asserts (without any further argument) that the May 2018 charge—which mentions at least some of these categories—"relates back" to the date of the January 2018 charge. Pl.'s Resp. Br. at 9. *See* 5/18/18 EEOC Charge. But even if Elzeftawy had not forfeited the argument by failing to adequately develop it, he would still be wrong. Generally, a charge may only "be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein." 29 C.F.R. § 1601.12(b). In order to "relate back to the date the charge was first received[,]" though, amendments alleging additional misconduct must "relate[] to or grow[] out of the subject matter of the original charge ... ." *Id.* And considering the January 2018 charge does not even *hint* at any discrimination based on Elzeftawy's race, national origin, color, ancestry, or religion, this means that the May 2018 charge can *only* relate back with respect to allegations concerning Elzeftawy's disability.

To make matters more complicated, though, Elzeftawy also provides a copy of *another* purported charge that he sent to the EEOC on April 10, 2018 as an amendment to the January 2018 charge. R. 26-1, Pl.'s Resp. Br., Exh. 3, 4/10/18 EEOC Charge. Indeed, on May 14, 2018, in what appears to be an email to the EEOC investigator on the case, Elzeftawy attaches the signed May 2018 form and explains that he is "agreeing to sign the Amended Charges only with the supplemental and

corrected facts set forth" in the April 2018 letter. *See* R. 26-1, Pl.'s Resp. Br., Exh. 5 at 1; McCarty Decl. ¶ 9. *Cf. Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 865 (7th Cir. 2010) ("Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate the allegations.") (cleaned up). It is not hard to understand why Elzeftawy had such a condition—the April 2018 document is extremely detailed, and apparently written by Elzeftawy himself, whereas the May 2018 form is very brief and was likely filled out by someone at the EEOC. In fact, the April 2018 letter contains numerous allegations concerning discrimination based on race, national origin, color, ancestry, and religion. *See, e.g.*, 4/10/18 EEOC Charge at 19-20 ("I have heard Mr. McSweeney make obscene and derogatory remarks about Turkish people, Middle-Easterners, Muslims and others"); *id.* at 20 ("I have seen others ... who are Caucasian, non-minorities, apparently non-Muslims[] who had suffered work-related disabilities and were ... apparently not harassed, discriminated against, ... and wrongfully discharged"). Like the May 2018 charge, though, these allegations do not "grow out" of the subject matter of the initial charge describing *disability* discrimination, so they cannot relate back to January 2018.

But Elzeftawy's April 2018 letter *does* constitute a "charge" on its own: it not only identifies Pernix as the employer (even providing details about various relevant subsidiaries), but it can also reasonably be construed as asking the EEOC to take remedial action. Elzeftawy writes that Pernix's "illegal mistreatment" of him "needs to be stop[ped]," expresses his "hope[s]" that his "Charge of Discrimination brings

38

about compensation" for him and for his family, and asks the EEOC for a Right to Sue letter. 4/10/18 EEOC Charge at 22-23. A reasonable EEOC investigator would interpret these statements as a request for the agency "to activate its machinery and remedial processes," *Holowecki*, 552 U.S. at 402. So although the April 2018 charge cannot relate back to the January 2018 charge—at least with respect to the non-disability-related allegations—it can serve as a stand-alone charge supporting Elzeftawy's Title VII claims. This does mean, however, that the Title VII claims are limited to conduct that occurred within 300 days of April 10, 2018—so any Title VII claims that premise liability on conduct before June 14, 2017 are time-barred. This includes Elzeftawy's allegations that McSweeney made racist comments about Muslims and Middle Easterners in the summer of 2016, and that Elzeftawy complained about and opposed these comments that same year. *See, e.g.*, Compl. at 20-21.

Importantly, though, this does not mean that the Title VII claims are dismissed; they are simply limited to conduct within the 300-day window. So, for instance, although the primary factual basis in the Complaint for Elzeftawy's hostile work environment claim seems to be McSweeney's derogatory comments about Muslims and Middle Easterners in the summer of 2016, *see, e.g.*, Compl. at 10, this *still* does not doom the claim. For one, plaintiffs are generally not required to plead the specific dates of unlawful conduct—especially when, as here, the dates are only really relevant for purposes of an affirmative defense. *See, e.g.*, *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) ("Complaints need not anticipate defenses and

attempt to defeat them."); *Flanagan v. Excel Staffing Sols., LLC*, 2018 WL 558499, at *3 (N.D. Ill. Jan. 25, 2018) (holding that plaintiff was not required to plead specific dates or times when he and other African-Americans were discriminated against).

Second, even if the 2016 comments cannot form the *basis* of any Title VII claims, they do bolster the plausibility of Elzeftawy's other allegations. According to Elzeftawy, McSweeney engaged in "rants ... regarding Middle-Easterners in general," which reasonably suggests that he made such derogatory comments more than once. Compl. at 31. McSweeney also allegedly told Elzeftawy that the company should no longer hire Muslims, and that it should get rid of the Muslim employees already working there. *Id.* at 21. In addition, the April 2018 charge says that Elzeftawy "heard Mr. McSweeney make obscene and derogatory remarks about Turkish people, Middle-Easterners, Muslims and others (who he seemed to lump[] in with terrorists)." 4/10/18 EEOC Charge at 20. Reading these allegations together (and in the light most favorable to Elzeftawy), it is plausible to infer that McSweeney engaged in this conduct on multiple occasions, and that at least some of it fell within the 300-day window. The same principles apply to Elzeftawy's other Title VII claims (and the ADA claims, too). So all in all, the fact that Elzeftawy's Title VII claims are limited to a specific time period does not automatically result in their complete dismissal—for now, that depends on the merits of Pernix's other arguments.[12] *Cf. Flanagan*, 2018

---

[12]Elzeftawy has not invoked any equitable doctrine to try and excuse his failure to timely file the EEOC charges—nor are there any facts at this point that would support it. Nevertheless, if he has a good-faith basis to believe he might be entitled to equitable tolling or estoppel, he may raise the issue via a motion for reconsideration or a request for some other relief. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[T]h[e] time

WL 558499, at *6 ("It is not clear, on the face of Flanagan's complaint, that his Title VII claims are time-barred. Therefore, the claims cannot be dismissed at this stage.").

Aside from the timeliness issue, Pernix initially argues that the Title VII claims were outside the scope of the May 2018 EEOC charge. *See* Def.'s Br. at 6-8. But apart from unsuccessfully challenging the *authenticity* of Elzeftawy's other charges, *supra* Part III(A)(2)(a), Pernix abandons the argument on reply, Def.'s Reply Br. at 9-11, so the Court will not address it.

### b. Adequacy of Title VII Claims

### i. Hostile Work Environment

Pernix does raise one final argument against Count 3 of the Complaint: that Elzeftawy failed to adequately plead hostile work environment and retaliation claims under Title VII. Def.'s Br. at 9-13.[13] Starting with the former: "To state a Title VII hostile work environment claim, a plaintiff must allege (1) she was subject to unwelcome harassment; (2) the harassment was based on her national origin or religion (or another reason forbidden by Title VII); (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability." *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cty.*, 804 F.3d 826, 833-34 (7th Cir. 2015). Elzeftawy alleges that Pernix illegally harassed him due to his national origin, race, color, ancestry, and religion. Compl. at 45. But unlike on the ADA claims, Pernix does

---

period for filing a charge is subject to equitable doctrines such as tolling or estoppel" but these doctrines "are to be applied sparingly.").

[13]Pernix does not raise a similar challenge to Elzeftawy's Title VII claim for disparate treatment.

not argue that Elzeftawy failed to allege a connection between the harassment and the various aforementioned categories. Instead, Pernix argues that the hostile work environment claim should be dismissed because the alleged conduct does not rise to the requisite level of severity, and because Elzeftawy fails to allege that McSweeney was a supervisor (for purposes of employer liability). Def.'s Br. at 9-11.

First, it bears emphasizing—given Pernix's assertions to the contrary—that the workplace does *not* have to be "hellish" to be actionable. *Cf.* Def.'s Br. at 9 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)). Since 1997, the Seventh Circuit has repeatedly repudiated the "hellish" standard it previously articulated in *Perry*, including as recently as 2019. *See, e.g.*, *Gates v. Bd. of Ed. of the City of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019) (holding that district court erred in part because it "relied on the 'hellish' standard, which is not a standard a plaintiff must satisfy."). Invocation of the "hellish" standard must stop. Instead, as mentioned above, "[t]o rise to the level of a hostile work environment, conduct must be sufficiently severe or [pervasive] to alter the conditions of employment such that it creates an *abusive* relationship." *Huri*, 804 F.3d at 834 (emphasis in original). In addition, "[i]t is important to recall that harassing conduct does not need to be both severe *and* pervasive." *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (emphasis in original). "One instance of conduct that is sufficiently severe may be enough. Conversely, conduct that is not particularly severe but that is an incessant

part of the workplace environment may ... be pervasive ... and corrosive enough that it meets the standard for liability." *Id.* (cleaned up).

Here, Elzeftawy alleges *throughout* the Complaint that McSweeney was his supervisor (as well as the President of Pernix Federal, one of the divisions of Pernix Group). *See, e.g.*, Compl. at 8-9, 14. He also alleges that McSweeney perpetrated the harassment—which, to repeat, involved rants equating Muslims and Middle Easterners with terrorists, and stating that Muslims should not be allowed to work at Pernix. These facts do not support the inference that McSweeney's harassing comments were an "*incessant* part of the workplace environment[,]" *Jackson*, 474 F.3d at 499 (emphasis added), even if he did make them more than once. Nevertheless, they do create a plausible inference that McSweeney's comments were more than "simple teasing" or "offhand" statements—they were actually abusive and severe. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (cleaned up). Indeed, given the power dynamics involved, the fact that McSweeney was Elzeftawy's *supervisor* magnifies the severity of the harassment (and provides a potential basis for employer liability). *See Alamo*, 864 F.3d at 550 (in determining whether a workplace is hostile, "[t]he specific circumstances of the working environment and the relationship between the harassing party and the harassed ... bear on whether that line is crossed.") (cleaned up); *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d

841, 848 (7th Cir. 2008) ("Under Title VII, an employer can be vicariously liable for a hostile work environment created by a supervisor[.]").

It is true, as Pernix points out, that it is not entirely clear whether McSweeney's comments were always directed at Elzeftawy specifically, and normally the impact of second-hand harassment is not as great as when directed at the plaintiff. *See* Def.'s Br. at 9 (quoting *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001)). But accepting the allegations in the Complaint as true, McSweeney's comments did not merely float into the ether—he apparently acted on them, and to Elzeftawy's detriment. So at this point, it is reasonable to infer that the harassment was directed at Elzeftawy given that (1) he is both Muslim and Middle Eastern and (2) that McSweeney ultimately did *not* allow him to return to work. This means the hostile work environment claim under Title VII survives—though only with respect to post-June 14, 2017 harassment.

### ii. Title VII Retaliation

Turning to Elzeftawy's retaliation claim under Title VII, Pernix first argues that the Complaint fails to allege conduct constituting protected activity under Title VII. Def.'s Br. at 12. As with retaliation claims under the ADA, "Title VII requires the plaintiff to allege that []he engaged in statutorily protected activity and was subjected to an adverse employment action as a result." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (cleaned up). Protected activities include opposing employment practices made unlawful under Title VII, whether internally or by filing a charge or participating in a Title VII investigation. *See, e.g.*, *Salas*, 493 F.3d at 924

44

(citing 42 U.S.C. § 2000e–3(a)). In this case, Elzeftawy alleges that he complained about (1) Pernix's decision to reduce the number of Muslim employees and (2) McSweeney's derogatory comments about Muslims and Middle Easterners.[14] Compl. at 10, 21. Neither of these allegations is "vague" or "obscure," as Pernix tries to argue. *See* Def.'s Br. at 13. Rather, they support the inference that Elzeftawy engaged in protected activity when he opposed discrimination on the basis of (at a minimum) religion and national origin.

According to Pernix, though, the Complaint also fails to allege that anyone in management or human resources knew about Elzeftawy's complaints. Generally, there "can be no causal link between protected activity and an adverse employment action if the employer remained unaware of the protected activity." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (cleaned up). But here, the facts suggest that Pernix—by way of McSweeney and Zayed—*was* aware of Elzeftawy's complaints. For one, immediately after describing McSweeney's suggestion to reduce the number of Muslim employees at Pernix, the Complaint alleges the following: "[a]lthough [McSweeney] and [Zayed] knew that Atef was an Egyptian-American Muslim, and Atef showed his opposition to such, they not only openly talked about such, but steered Pernix Group in that direction with less and less Muslims being employed ... ." Compl. at 21. Although this allegation could have been written *much* more clearly, it does suggest that Elzeftawy "showed his opposition"—to the discriminatory hiring practices referenced—directly *to* Zayed and

---

[14]On the other hand, Elzeftawy's complaints about safety issues are not protected, because they were not about discrimination or other unlawful practices under Title VII.

McSweeney, both of whom held executive and supervisory positions, *see, e.g.*, *id.* at 14.[15] Moreover, the Complaint suggests that on at least one occasion, Elzeftawy complained about McSweeney's statements to *McSweeney himself*. *Id.* at 21. So Elzeftawy has plausibly alleged that Pernix knew about his complaints.

Nevertheless, Pernix is ultimately correct that the Complaint fails to plead a causal link between Elzeftawy's complaints and an adverse employment action. To be clear, Count 3—containing the Title VII claims—does not actually specify the allegedly retaliatory conduct. But considering there is no other employment action in the Complaint that could be interpreted as adverse, it is reasonable to infer that Elzeftawy is once again invoking Pernix's refusal—starting in January 2017—to allow him to return to work. The issue, however, is the absence of any facts to support the inference that Pernix's decision was motivated by Elzeftawy's *complaints*. And unlike on the ADA claims, Elzeftawy's protected activity under Title VII is not even close in time to Pernix's conduct in January 2017 and onwards—there was a period of around six months between the two. That is, Elzeftawy opposed McSweeney's statements and Pernix's anti-Muslim hiring practices sometime in *June or July 2016*—and there is nothing to suggest that he complained about discrimination at

---

[15]In an apparent attempt to downplay the fact that Zayed himself is from the Middle East, Elzeftawy alleges that Zayed, "though from the Middle-East[,] openly represented himself to be a Christian, celebrated Christmas … [and] had certainly been openly Westernized by a drinking habit that he openly embraced and displayed." Compl. at 21. These allegations are bizarre and borderline offensive: to say "though from the Middle-East openly represented himself to be a Christian" implies that there are no Christian Arabs. And, at least as currently alleged, what do Zayed's celebration of Christmas and the fact that he was "Westernized" (whatever that means) have anything to with an inference of discrimination? At trial, would it be proper to cross-examine Zayed on whether he celebrates Christmas? Or ask whether he drinks openly?

any other time (or that the retaliation claim is based on the filing of the January 2018 charge). Although there is "no bright-line timing rule," a lengthy period between the protected activity and the adverse action generally weakens any inference of retaliation, *Alamo*, 864 F.3d at 556 (cleaned up)—and here there was none to begin with.[16]

For the reasons discussed above, Elzeftawy's retaliation claim under Title VII is dismissed (for now without prejudice in case he can allege facts to suggest a causal link). Elzeftawy's other Title VII claims—for disparate treatment and hostile work environment—survive as to conduct occurring within 300 days of the April 10, 2018 charge (and in the event Elzeftawy successfully re-alleges the retaliation claim, that would also be limited to the 300-day window).

### 4. 42 U.S.C. § 1981 (Count 4)

Elzeftawy also brings a number of claims under 42 U.S.C. § 1981, which prohibits "racial discrimination in the making and enforcing of contracts." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 393 (7th Cir. 2007), *aff'd*, *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008). To state a Section 1981 claim, Elzeftawy must allege that (1) he is a member of a racial minority; (2) Pernix had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making

---

[16]Although it is true that reducing the number of Muslim employees was one of the practices that Elzeftawy complained about (and allegedly ultimately suffered from), there is an important, albeit subtle, difference between discrimination based on someone's *identity* and retaliation motivated by someone's *conduct*. *See Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) (explaining that "all anti-retaliatory provisions ... provide[] protections not because of who people are, but because of what they do."). On these facts, there is nothing to suggest the latter.

or enforcing of a contract. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996); 42 U.S.C. § 1981(a)-(b). Unlike the ADA and Title VII, Section 1981 does not have any charge-filing requirements. Instead, Pernix's primary argument on Elzeftawy's Section 1981 claims is that he does not adequately allege that he is a member of a racial minority. Def.'s Br. at 14-15. According to Pernix, the Section 1981 claims must be dismissed because the allegations in the Complaint pertain only to Elzeftawy's religion and Egyptian-American heritage, not his race. *Id.*

But courts define "race" much more broadly under Section 1981 than Pernix suggests. In *St. Francis Coll. v. Al-Khazraji*, the Supreme Court held that a person of "Arab[] ancestry was protected from racial discrimination under § 1981[.]" 481 U.S. 604, 607, 613 (1987). Based on the legislative history of Section 1981, which "had its source in the Civil Rights Act of 1866," as well as on 19th century dictionary and encyclopedic definitions, the Supreme Court concluded that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 612-13. So the plaintiff, who was born in Iraq, could make out a case under Section 1981 if he was discriminated against "based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion … ." *Id.* at 613.

It is true that someone who is Egyptian-American, like Elzeftawy, is simply a native of the country of Egypt or descended from people born in Egypt, and is not necessarily a member of a distinct "race" as we might define it today. But the Supreme

Court explained that, historically, even Germans and Englishmen—groups we now label as "white"—were considered separate races at the time Section 1981 was adopted. *St. Francis Coll.*, 481 U.S. at 611-12. Moreover, the Seventh Circuit explained in *Abdullahi v. Prada USA Corp.*, with respect to an Iranian plaintiff, that discrimination can be either political—grounded, for example, in the United States' foreign policy towards Iran—or it can be based on someone "seeming to be [a] member of a foreign 'race.'" 520 F.3d 710, 712 (7th Cir. 2008). Only the latter is actionable under Section 1981. *See id.*; *see also Lalvani v. Cook Cty., Ill.*, 269 F.3d 785, 789 (7th Cir. 2001) (applying Section 1981 to claims of plaintiff from India); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 230 (7th Cir. 1995) (explaining that Italians may constitute a "race" under Section 1981). In this case, then, Elzeftawy is eligible for protection under Section 1981 as someone with Egyptian or Middle-Eastern ancestry.

But whether Elzeftawy has alleged enough facts to show that he has stated a claim under Section 1981 is an entirely different question. Elzeftawy brings Section 1981 claims for disparate treatment, hostile work environment, and retaliation, but as Pernix correctly points out, a few of the underlying factual allegations refer only to Elzeftawy's religion, not his race or his ancestry. *See, e.g.*, Compl. at 21 (alleging that McSweeney suggested Pernix would be more competitive in the bidding process for U.S. government contracts if it did not have Muslim employees). At the same time, though, considering that the *majority* of the factual allegations reference Elzeftawy's religion in connection with his ancestry and ethnicity, it is not at all clear that he

meant to limit any of the claims to just his religion. *See, e.g.*, Compl. at 10 (alleging that Elzeftawy opposed McSweeney's "racist[] comments ... about Muslims and Middle-Easterners ... whom he seemingly lumped in with 'terrorists'"); *id.* at 21 (alleging that although McSweeney and Zayed knew Elzeftawy "was an Egyptian-American Muslim," they still openly talked about hiring less Muslim employees). Not only that, Elzeftawy alleges race discrimination in both the April and May 2018 charges (even if Section 1981 claims do not require plaintiffs to go through the EEOC first, the Court may still consider the circumstantial facts alleged in the charges). For these reasons, the Court will infer in Elzeftawy's favor that in the few allegations referencing only religion, Elzeftawy actually meant to say "Middle Eastern Muslim" or "Egyptian-American Muslim."

Having said that, courts analyze Section 1981 claims using the same standards as Title VII (and aside from challenging the sufficiency of the Complaint's allegations on race, Pernix does not make any other arguments on the Section 1981 claims). *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). So as with Count 3, Elzeftawy's Section 1981 claims for disparate treatment and hostile work environment survive, but his retaliation claim is dismissed (without prejudice) for failure to adequately plead a causal connection. (The difference is that the Section

1981 claims do not require exhaustion through the EEOC and are not limited to any specific time period.)

### 5. Federal False Claims Act (Count 5)

Elzeftawy's final federal claim is brought under the False Claims Act (FCA), which "prohibits the submission of false and fraudulent claims for payment to the government." *Glaser v. Wound Care Consultants, Inc.*, 570 U.S. 907, 912 (7th Cir. 2009) (citing 31 U.S.C. § 3729(a)). It also prohibits retaliation against employees for taking an action "in furtherance" of the False Claims Act, which includes putting employers "on notice of potential" litigation, reporting suspected misconduct to internal supervisors, and "other efforts to stop" violations of the Act. *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847-48 (7th Cir. 2012) (cleaned up); 31 U.S.C. § 3730(h). According to Elzeftawy, in its various contracts with the federal government, Pernix falsely represented that it was following federal safety laws and anti-discrimination laws, and that it was conducting periodic inspections to ensure compliance with these laws. Compl. at 49. But when Elzeftawy allegedly blew the whistle on Pernix's conduct and tried to stop the submission of false claims, Pernix retaliated against him—by refusing to provide him with a reasonable accommodation (and effectively discharging him); interfering with his medical leave rights; discriminating against him; and harassing him. Compl. at 50. Unfortunately for

Elzeftawy, though, he has failed to plausibly plead this claim, so it will be dismissed (though without prejudice).

For one, Elzeftawy's allegations that he engaged in protected activity under the FCA are far too vague. The Complaint merely alleges, in a conclusory fashion, that Elzeftawy "opposed, investigated, and tried to stop the illegal conduct, practices and policies and false claims." Compl. at 12. *See also id.* at 16 (alleging that Elzeftawy engaged in "efforts to stop what he in good faith believed to be fraudulent certifications"); *id.* at 50 ("Plaintiff investigated such false certifications and false claims and tried to stop such"). On a motion to dismiss, though, facts that "are actually legal conclusions or elements of the cause of action ... may be disregarded ... ." *McCauley v. City of Chi.*, 671 F.3d 611, 617 (7th Cir. 2011). Here, Elzeftawy's allegations are nothing more than a vague recitation of the element of protected activity—that is, "efforts to stop" violations of the FCA—so they are devoid of factual content and need not be accepted as true.

But even if the allegations of protected activity were plausible, the Complaint still fails to state a retaliation claim. As with Title VII and ADA retaliation claims, employees must adequately allege that they were retaliated against *because* of their efforts to stop violations of the False Claims Act. But if employers do not know about the protected activity in the first place, then they cannot possibly have retaliated against the employee. And there is nothing in the Complaint to suggest that any Pernix supervisor, executive, HR associate, or other decision-maker knew of Elzeftawy's efforts to "stop" the alleged false certifications—to infer otherwise would

be pure speculation. Indeed, on these facts, it is equally probable that Elzeftawy merely complained to a co-worker, and that Pernix never knew of his "efforts" at all. Ultimately, because Elzeftawy's allegations fail to "raise a right to relief above the speculative level," *see Twombly*, 550 U.S. at 555, his retaliation claim under the FCA must be dismissed, though without prejudice to additional facts that might help establish the requisite causal connection.

### B. State-Law Claims

### 1. California Statutory Claims

### a. The California Family Rights Act (Count 6) and the California Fair Housing and Employment Act (Count 7-11)

Turning to the state-law claims, Elzeftawy brings Count 6 under the California Family Rights Act (CFRA), Cal. Gov.'t Code § 12945.2, and Counts 7-11 under the California Fair Housing and Employment Act (FEHA), *id.* at § 12900 *et seq*. The Court's analysis will start with the CFRA, which is contained within FEHA. *See, e.g.*, *Faust v. Cal. Portland Cement Co.*, 58 Cal. Rptr. 3d 729, 739 (Cal. Ct. App. 2007).

Like the FMLA, the CFRA makes it an "unlawful employment practice for any employer … to refuse to grant a request by any employee with more than 12 months of service with the employer, and who has at least 1, 250 hours of service with the employer during the previous 12-month period … to take up a total of 12 workweeks in any 12-month period for family care and medical leave." Cal. Gov't Code § 12945.2(a). The CFRA also makes it unlawful for an employer "to refuse to hire, or to discharge, fine, suspend, expel, or discriminate against" an individual who exercises their rights under the Act, *id.* at § 12945.2(l), "to interfere with, restrain, or deny the

53

exercise of, or the attempt to exercise" their rights under the Act, *id.* at § 12945.2(t). Elzeftawy alleges that Pernix violated the CFRA by harassing him, interfering with his leave, discriminating against him, retaliating against him, and refusing to hire or rehire him for exercising his rights to medical leave under the Act. Compl. at 52.

For its part, Pernix contends that the CFRA cannot apply because the conduct alleged does not implicate California, *see, e.g.*, Def.'s Br. at 22-24, 26-27, arguing, essentially, that Elzeftawy's CFRA claim "implicates the so-called presumption against extraterritorial application[,]" *Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011).[17] As a general matter, "'the statutes of a state have no force beyond its boundaries.'" *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1080 (9th Cir. 2018) (quoting *N. Alaska Salmon Co. v. Pillsbury*, 162 P. 93, 94 (Cal. 1916)). And as with the federal presumption, California courts "presume the [California] Legislature did not intend a statute to be operative, with respect to occurrences outside the state, … unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter, or history." *Id.* (cleaned up). In fact, "[t]he presumption against extraterritoriality has a mirror-image relative in the form of a presumption in favor of *intraterritorial* application[,]" meaning "courts

---

[17]To be clear, Pernix is not making a choice-of-law argument here—rather, on this and on Elzeftawy's other California statutory claims, Pernix focuses on the adequacy of the factual allegations and on the question of *extraterritoriality*. Pernix only raises a choice-of-law challenge—advocating for application of Illinois law—on Elzeftawy's common-law claims in Counts 15-18, which will be addressed later in the Opinion. *See McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) ("The choice of law issue may be waived … if a party fails to assert it."). *Cf. Northern Tr. Co. v. Peters*, 69 F.3d 123, 129-30 (7th Cir. 1995) (applying substantive U.K. law to non-statutory tort and contract claims per Illinois choice-of-law rules, and Illinois law to the Illinois statutory claims).

ordinarily interpret California statutes to apply to conduct occurring anywhere within California's borders, absent evidence [that] a more limited scope was intended." *Ward v. United Airlines, Inc.*, 466 P.3d 309, 317 (Cal. 2020) (emphasis in original). With respect to the CFRA (and FEHA generally), there is nothing in the text or legislative history to suggest that the California Legislature intended them to apply to unlawful conduct committed outside California. *See, e.g.*, *Guillory v. Princess Cruise Lines, Ltd.*, 2007 WL 102851, at *4-5 (Cal. Ct. App. Jan. 17, 2007). So the presumption against extraterritoriality applies to the CFRA, and to FEHA.

The next question is whether Elzeftawy's "proposed application" of the CFRA "would cause it to operate, impermissibly, with respect to occurrences outside" California. *Sullivan*, 254 P.3d at 248. Elzeftawy relies on *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914 (Cal. 2006) to argue that the CFRA (and the other California statutes he has invoked) should apply because he is a California resident and because Pernix's conduct injured him while he was in California. *See, e.g.*, Pl.'s Resp. Br. at 25. It is true that in *Kearney*, the California Supreme Court upheld a California resident's claim against an out-of-state defendant under § 637.2 of the California Penal Code, even though the misconduct had occurred in Georgia. 137 P.3d at 930-31. But *Kearney* is distinguishable. Primarily, the California Supreme Court clarified that applying a California statute to "a multistate event in which a crucial element … occurred in California" is *not* an extraterritorial application of that statute—at least not under the unique circumstances presented in *Kearney*. *Id.* (cleaned up). As the state high court emphasized, the out-of-state misconduct in that

case *depended* on certain events—the secret recording of California residents while they were engaging in confidential conversations—occurring contemporaneously in California. *Id.* The outcome turned not on the plaintiffs' residency, but on the connection between California and a crucial element of the claim. In other words, *Kearney* does not stand for the proposition that California statutes may apply to out-of-state conduct by a foreign defendant so long as a California resident is injured—rather, the connection of that misconduct to the state of California is still key. This is consistent with the California Supreme Court's general position that the presumption against extraterritoriality is a presumption "against an intent to encompass conduct occurring in a foreign jurisdiction *in the prohibitions and remedies* of a domestic statute." *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 554 n.20 (Cal. 1999) (cleaned up) (emphasis added).

As a matter of fact, the California Supreme Court recently considered whether Section 226 of the California Labor Code applies to state residents who work principally outside California, and it explicitly rejected residency as the determinative factor. *Ward*, 466 P.3d at 317. The court reasoned that "[a]pplication of [S]ection 226 to those who work primarily outside the state, based only on their choice to reside [there], would create overlap and potential conflict-of-laws concerns" when California law differs from the law of the state where the employee primarily works. *Id.* at 323. Instead, "when it comes to the regulation of interstate employment," and given that "many employment relationships … will have elements of both" extra- and intra-territorial work, "[t]he better question is what kinds of

California connections will suffice to trigger the relevant provisions of California law." *Id.* at 318-19.

That said, "the connections that suffice for purposes of one statute may not necessarily suffice for another." *Ward*, 466 P.3d at 319. With respect to FEHA (which encompasses the CFRA), "[t]he majority of courts in California and other jurisdictions have found that the extraterritorial application of FEHA is determined by the situs of both employment and the material elements of the cause of action, as opposed to residence of the employee or the employer." *Russo v. APL Marine Servs., Ltd.*, 135 F. Supp. 3d 1089, 1094 (C.D. Cal. 2015) (collecting cases). So in order to determine whether the Complaint here suggests an impermissibly extraterritorial application of the CFRA and FEHA, the Court must first consider whether Elzeftawy's allegations adequately connect the location of both his employment and the proscribed conduct to California.[18]

Starting with the former, *Ward* makes it clear that Califorina need not be the *exclusive* site of employment. In *Ward*, the California Supreme Court held that the

___

[18]In fact, the FEHA regulations explain that "employees located outside of California are not themselves covered by the protections of the Act if the allegedly unlawful conduct did not occur in California, or the allegedly unlawful conduct was not ratified by decision makers or participants in unlawful conduct located in California." Cal. Code Regs. tit. 2, § 11008. *See also id.* at § 11007; Cal. Gov't Code § 12935. It is true that "the phrase 'located outside of California' is ambiguous; it is unclear whether it refers to nonresidents of California or employees located outside of California" at the time of the alleged misconduct. *English v. Gen. Dynamics Mission Sys., Inc.*, 2019 WL 2619658, at *7. But even though the caselaw on the extraterritoriality of FEHA (and by extension, the CFRA) is sparse, the relevant California state court decisions discussed in this Opinion all point to the latter interpretation—that the phrase refers to employees located outside of Califorina at the time of the alleged misconduct. *See, e.g., Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011); *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539 (Cal. 1999); *Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296 (Cal. 1996); *N. Alaska Salmon Co. v. Pillsbury*, 162 P. 93 (1916); *Guillory v. Princess Cruise Lines, Ltd.*, 2007 WL 102851 (Cal. Ct. App. Jan. 17, 2007).

application of Section 226 of the California Labor Code "logically depends on whether the employee's principal place of work is in California." *Ward*, 466 P.3d at 320. Employees who work in California most of the time would be protected under Section 226, as would employees who do not work principally in any one state, but who have a "definite base of operations in California" and perform at least some work there. *Id.* at 324. *See also Sullivan*, 254 P.3d at 239, 243 (holding that nonresident employees of a California company who worked primarily in their home states, but who also worked in California "for entire days or weeks" at a time, were entitled to Labor Code protections); *id.* at 242-43 (conversely, California law would generally "not apply to nonresident employees of out-of-state businesses who enter California temporarily during the course of the workday."). Of course, it is true that "each law must be considered on its own terms[,]" and that *Ward* concerned the California Labor Code, not FEHA. *Id.* at 319. Nevertheless, *Ward* (and *Sullivan*) strongly suggests that the CFRA and FEHA would apply even if an employee works out-of-state, so long as the employee's work is substantially connected to California.

Here, we know that Elzeftawy was injured on a job site in South Korea, but we do not know whether South Korea was his primary work location. Elzeftawy tries to do some damage control in his response brief, alleging that he worked for Pernix in California *before* going to South Korea. Pl.'s Resp. Br. at 29. He also alleges that while he was on leave for his injury in California, Pernix "sought [his] assistance with work" and that he "initially patiently responded to the interference" with his leave. *See id.*; Compl. at 19. But even accepting these allegations as true, there is nothing to suggest

58

that Elzeftawy's "work" in California was anything more than occasional and transient, or that his work in South Korea was somehow connected to California. Indeed, Elzeftawy's own admissions weaken any potential inference that his work for Pernix was *ever* sufficiently connected to California to warrant the application of the CFRA.

For one, Elzeftawy wrote in the April 2018 EEOC Charge that his injury "was caused by safety and health issues that [he] had complained about on multiple occasions[,]" implying that he had been at the South Korea job site for some time before November 2016. *See* 4/10/18 EEOC Charge at 16. What's more, Elzeftawy makes multiple references to having "worked all over the world," including for Pernix. For example, between September 2012 and August 2015, Elzeftawy opened a Pernix location in Dubai, and established and managed Pernix programs in Guam. *Id.* at 17-18; *see also* Compl. at 23 ("[Plaintiff] indicated … that he was willing to move or travel anywhere in the world for his work (as he previously had done for [Pernix])"). But despite including a detailed work history dating back to 1999, nowhere in the April 2018 Charge does Elzeftawy ever mention working in California. And most importantly, of course, he also concedes that he was working on a U.S. government project in South Korea at the time of the injury. So even giving Elzeftawy the benefit of all reasonable inferences, the facts point to minimal work-related contact with California. *Cf. Sullivan*, 254 P.3d at 243 (although California law does not generally follow California residents wherever they go throughout the United States, it might

follow resident employees of California employers who just "leave the state temporarily ... during the course of the normal workday.").

Turning to the second factor in the extraterritoriality analysis, the Court must examine where "the material elements of the cause of action" occurred—that is, the location of the alleged proscribed conduct. The California Court of Appeal examined a similar issue in *Guillory*, which is perhaps the most factually analogous case to Elzeftawy's. *Guillory*, 2007 WL 102851. There, the employee was a California resident who worked primarily outside the state (on the high seas and—unlike Elzeftawy—for a company with corporate offices in California). *Id.* at *1. The California court held that FEHA did not apply to the employee because "the material elements of [her] cause of action occurred outside California"—in particular, the determination that she was unfit to continue working on the ship (due to a high-risk pregnancy) and the decision to make her disembark. *Id.* at *4-5. In other words, the employee's FEHA claim contemplated extraterritorial application because both the alleged misconduct and the locus of the work took place outside California—and even though the employer *and* the employee had strong residency ties to the state, this was still not enough to overcome the presumption. Ultimately, California's interest in protecting its residents from employment misconduct is significantly weakened

when there is a minimal connection between the relevant conduct and the state. *See Ward*, 466 P.3d at 318.

As in *Guillory*, the facts in Elzeftawy's case also suggest that the alleged unlawful conduct occurred outside California.[19] The relevant conduct is Pernix's alleged retaliation, discrimination, refusal to hire or rehire, and attempts to interfere with Elzeftawy's leave, all for trying to exercise his rights under the CFRA.[20] Compl. at 52; *see also* Cal. Gov't Code § 12945.2. But Elzeftawy does not allege that any of the unlawful conduct took place in California. Instead, what he *does* allege is that Pernix is a Delaware corporation with headquarters in Illinois; that most of Pernix's communications to Elzeftawy came from Illinois; that Pernix has corporate offices in Illinois and North Carolina; and that his direct supervisors, Zayed and McSweeney, were high-ranking executives at the company. Compl. at 5, 7-8, 31; 4/10/18 EEOC Charge at 15. On these facts, the Court cannot reasonably infer that any of the alleged unlawful conduct occurred in or was ratified by Pernix decision-makers in California,

---

[19]It is worth noting first that the relevant conduct is only that which creates liability under the statute. The California Supreme Court emphasized this (admittedly subtle) distinction in *Sullivan*, when it considered whether the state's unfair competition law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.*, applies to overtime work performed by nonresidents in *other* states. 254 P.3d at 240, 247. The specific provision at issue stated that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives [overtime] compensation ... ." *Id.* (cleaned up). So although the employer's erroneous decision to classify certain employees as exempt from overtime payment was made in California, that fact was not determinative. Rather, the liability-creating conduct was the failure to pay overtime wages, and absent a showing that payment (or lack thereof) occurred in California, the California Supreme Court could not find that the UCL applied under those circumstances.

[20]In other words, even though Elzeftawy claims that Pernix's employee handbook contains fraudulent provisions, that is not proscribed conduct under the CFRA, so it is not relevant to the extraterritoriality analysis where in the United States Pernix drafted or disseminated the handbook.

or was otherwise substantially connected to the State—not when all the facts point to such decisions being made at headquarters.

The same goes for the FEHA claims, Cal. Gov't Code § 12900 *et seq.*, in Counts 7-11 of the Complaint. *See, e.g.*, *Anderson v. CRST Int'l, Inc.*, 685 Fed. App'x 524, 525-26 (9th Cir. 2017) (applying presumption against extraterritoriality and affirming dismissal of California resident's FEHA claims because misconduct occurred out-of-state); *Rulenz v. Ford Motor Co.*, 2013 WL 2181241, at *4 (S.D. Cal. May 20, 2013) (explaining that to avoid extraterritorial application of FEHA, California-resident-plaintiff still had to allege that injurious conduct took place in California). Elzeftawy claims that Pernix violated the following sections of FEHA: Sections 12940(a) and 12940(j)(1), which prohibit employers from discharging, discriminating against, harassing, or refusing to hire someone based on their race, religion, color, national origin, ancestry, and disability (among others); Section 12940(h), which prohibits employers from retaliating against someone for opposing practices forbidden by FEHA; Section 12940(i), which makes it unlawful for any person to aid, abet, incite, compel, or coerce the commission of any practice forbidden by FEHA; and Sections 12940(k), 12940(m)(1), and Section 12940(n), which require employers to take reasonable steps to prevent discrimination and harassment, to make reasonable accommodations for disabled employees, and to engage in a timely, good faith, and interactive process with employees who request reasonable accommodations. *See* Cal. Gov't Code §§ 12940(a), (h), (i), (j)(1), (k), (m)(1), and (n); Compl. at 53-70. As with

Elzeftawy's CFRA claim, there are no facts to indicate that any of the aforementioned proscribed conduct occurred (or was ratified by Pernix decision-makers) in California.

Because Counts 6-11 of the Complaint, as alleged, would require an impermissibly extraterritorial application of both the CFRA and FEHA, they must be dismissed. But this dismissal will be without prejudice, in the event Elzeftawy can allege facts setting forth a stronger connection between his employment, the alleged misconduct, and California.[21]

### 2. California Labor Code (Counts 12 and 14)

Elzeftawy also brings claims under Sections 6310 and 6400 (Count 12), and section 1102.5 (Count 14) of the California Labor Code.

### a. Sections 6310 and 6400 (Count 12)

Starting with Count 12, Sections 6310 and 6400 of the California Labor Code—which are part of the California Occupational Safety and Health Act of 1973 (Cal-OSHA)—prohibit retaliation against employees who complain about or report

---

[21]Although the defense does not raise the issue, it merits mentioning that "[i]n order to be entitled to file a civil action in court based on FEHA violations, an employee must first exhaust administrative remedies. ... An employee exhausts administrative remedies by filing a complaint with the [Department of Fair Employment and Housing] within one year of the occurrence of the allegedly unlawful act, and obtaining a notice of the right to sue ... ." *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 902 (E.D. Cal. 2017) (citing *Blum v. Superior Court*, 141 Cal. App. 4th 418, 422 (Cal. Ct. App. 2006)). *See also Schifando v. City of Los Angeles*, 79 P.3d 569, 572-73 (Cal. 2003). Given the exhaustion and timeliness issues presented by the ADA and Title VII claims, Elzeftawy might want to take a closer look at his FEHA claims (and narrow them as appropriate) should he wish to replead them.

Similarly, Elzeftawy should keep in mind that even the most expansive definition of California extraterritoriality is still limited by federal due process. It is well-established "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (cleaned up). As presently alleged, the facts in the Complaint make the application of California law constitutionally questionable at best.

workplace health and safety violations or injuries (whether internally or to outside government agencies). *See Ferrick v. Santa Clara Univ.*, 181 Cal. Rptr. 3d 68, 81 (Cal. Ct. App. 2014). *See also* Cal. Lab. Code § 6400 (describing when citations for safety violations may be issued for multiemployer worksites). "Section 6310, independently and together with other provisions of Cal–OSHA, reflects a significant public policy interest in encouraging employees to report health and safety hazards … without fear of discrimination or reprisal[,]" *Ferrick*, 181 Cal. Rptr. 3d at 81 (collecting cases). According to Elzeftawy, his complaints about health and safety issues in the workplace were a "substantial motivating reason" for Pernix's alleged refusal to hire or rehire him; refusal to provide him with either a reasonable accommodation or a timely, good faith, interactive process for determining such an accommodation; and decisions to harass him, discriminate against him, retaliate against him, and wrongfully discharge him. Compl. at 72.

Pernix, however, argues that Elzeftawy's claims under Sections 6310 and 6400 of the California Labor Code must be dismissed because Cal-OSHA does not apply under the alleged circumstances. Def.'s Br. at 28. Pernix is correct. Cal-OSHA extends only to "places of employment" within California. *Taylor v. Lockheed Martin Corp.*, 92 Cal. Rptr. 2d 873, 881 (Cal. Ct. App. 2000). Section 6303 of the Act defines "place of employment" as "any place ... where employment is carried on, *except a place where the health and safety jurisdiction is vested by law in, and actively exercised by, any state or federal agency other than the division*." Cal. Lab. Code § 6302(d) (emphasis added). The "division" refers to the Division of Occupational Safety and Health, Cal.

64

Lab. Code § 6302(d), which administers and enforces Cal-OSHA, and which has jurisdiction only over "place[s] of employment *in this state* ... [,]" *id.* at § 6307. *See also, e.g.*, *Murray Co. v. Occupational Safety & Health Appeals Bd.*, 102 Cal. Rptr. 3d 513, 515-16 (Cal. Ct. App. 2009).

As explained earlier in this Opinion, the facts alleged fail to raise a reasonable inference that Elzeftawy's "place of employment" was in California. Although Elzeftawy once again mentions that Pernix asked him to work in December 2016 while he was on leave, Pl.'s Resp. Br. at 29, given all the other facts saying that he primarily worked in *South Korea*, *see supra* Part III(B)(1)(a), this is not enough to adequately plead that his "place of employment" was in California. Nor can it be said—on these facts—that Elzeftawy's cause of action arose in California. The California Legislature enacted Cal-OSHA "for the purpose of assuring safe and healthful working conditions" in places of employment *in California. See* Cal. Lab. Code § 6300. In contrast, Elzeftawy complained about unsafe conditions in *South Korea*, meaning that Count 12 arose out of Pernix's alleged unlawful response to Elzeftawy's complaints about safety at an *out-of-state* work location.[22] The Court

---

[22]Notably, in cases where the employee worked on a federal enclave (such as a U.S. military base) within the state, California courts have relied on the employee's place of employment—and not where the employee was located at the time of the wrongful conduct—to determine whether California law governs. In *Taylor*, for example, the California Court of Appeal held that the employee's claims—including those brought under Cal-OSHA—arose on the enclave even though he had been placed on paid suspension and was not working on the base when he was allegedly wrongfully terminated, meaning that the claims were governed by the enclave's law. 92 Cal. Rptr. 2d at 878-82. *See also Lockhart v. MVM, Inc.*, 97 Cal. Rptr. 3d 206, 212 (Cal. Ct. App. 2009) ("Although [appellant] was at home at the time she received her termination letter ... appellant was the employee of a federal contractor operating on a federal enclave. Thus, her employment claims are governed by the enclave's law."). Although it is true that federal-enclave cases present a complicated question of

cannot locate—nor does Elzeftawy cite to—any caselaw, statutory language, or even legislative history suggesting that the state of California intended Cal-OSHA to regulate working conditions abroad (let alone those maintained by out-of-state employers).

Because Elzeftawy has failed to adequately allege that his "place of employment" was in California, his claims under Sections 6310 and 6400 of the California Labor Code must be dismissed (though without prejudice to allow Elzeftawy an opportunity to amend).

### b. Section 1102.5 (Count 14)

Next up is Count 14 of the Complaint, which is basically a retaliation claim under Section 1102.5 of the California Labor Code. "Labor Code section 1102.5 is a whistleblower statute, the purpose of which is to encourag[e] workplace whistle-blowers to report unlawful acts without fearing retaliation." *Soukup v. Law Offices of Herbert Hafif*, 139 P.3d 30, 48 (Cal. 2006). Section 1102.5(b) prohibits employers from "retaliat[ing] against an employee for disclosing information ... to a government or law enforcement agency [or] to a person with authority over the employee ... if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(b). Similarly, Section 1102.5(c) makes it unlawful to "retaliate against an employee for refusing to participate in an

---

federalism that is not at issue in Elzeftawy's case, *Taylor*'s emphasis on the place of employment in determining where the cause of action arose is nevertheless helpful here.

activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." *Id.* at § 1102.5(c).

For his part, Elzeftawy alleges that Pernix's actions against him were motivated by his opposition to Pernix's violations of the FMLA, the ADA, Title VII, Section 1981, the federal False Claims Act, the California Fair Housing and Employment Act, the California Family Rights Act, the California False Claims Act, and the California Labor Code. Compl. at 78-79. To survive dismissal, though, Elzeftawy must—as with any retaliation claim—plausibly allege that (1) he engaged in a protected activity, (2) Pernix subjected him to an adverse employment action (that is, conduct that would dissuade protected activity), and (3) there is a causal link between the two. *See Soukup*, 139 P.3d at 48. Unfortunately for Elzeftawy, his claim fails on the third element.

Before getting to the question of causation, though, it is necessary to identify the relevant protected activity. Under Section 1102.5(b), an employee engages in a protected activity if he reports reasonably based suspicions of illegal conduct to a government agency, or internally to someone with authority over the employee or with authority to investigate or correct the misconduct. *See Mokler v. Cty. of Orange*, 68 Cal. Rptr. 3d 568, 580-81 (Cal. Ct. App. 2007); *Siazon v. Hertz Corp.*, 2019 WL 1170778, at *16 (N.D. Cal. Mar. 13, 2019) (collecting cases). In addition, under Section

67

1102.5(c), an employee is also protected if he refuses to participate in a work activity that he reasonably believes would constitute a violation of federal or state law.

Here, Elzeftawy does not allege that he ever refused to participate in an activity because he thought it would be illegal; rather, he asserts in Count 14 that he "[stood] up for his rights" and that he opposed Pernix's allegedly illegal practices. *See* Compl. at 79. This vague recitation of what generally constitutes "protected activity" cannot support a retaliation claim. *See, e.g.*, *McCauley*, 671 F.3d at 617. Nevertheless, there is one allegation earlier in the Complaint that might qualify as a report of illegal activity within the meaning of Section 1102.5: Elzeftawy's Summer 2016 complaint to McSweeney regarding McSweeney's own racist comments about Muslims and people from the Middle East. Compl. at 10, 20-21. *Cf. Jaramillo v. Cty. of Orange*, 133 Cal. Rptr. 3d 751, 763 (Cal. Ct. App. 2011) (assistant sheriff's report to county sheriff regarding county sheriff's own misconduct was protected activity under § 1102.5).

Generally, "exclusively internal administrative" matters—such as requesting additional staff to ensure school safety, or forwarding student complaints about a teacher—would not qualify as a disclosure intended to "blow the whistle" on a legal violation. *See Siazon*, 2019 WL 1170778, at *15 (quoting *Conn v. W. Placer Unified Sch. Dist.*, 113 Cal. Rptr. 3d 116, 131 (Cal. Ct. App. 2010)). But even if it is not clear exactly *what* Elzeftawy said to McSweeney, given the context of Pernix's alleged practice of intentionally hiring fewer Muslims, it cannot be said that Elzeftawy's complaint about McSweeney's racism was a routine workplace grievance. *Cf. Patten v. Grant Joint Union High Sch. Dist.*, 37 Cal. Rptr. 3d 113, 118 (Cal. Ct. App. 2005)

68

("To exalt ... internal personnel disclosures with whistleblower status would ... thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from ... routine workings and communications"). At this stage, and looking at the Complaint as a whole, Elzeftawy has plausibly alleged that he disclosed "reasonably based suspicions" that McSweeney was violating federal and state anti-discrimination laws (such as Title VII, Section 1981, and the California Fair Housing and Employment Act). *See, e.g.*, *Madrid v. Cty. of Mono*, 2014 WL 2889910, at \*5 (E.D. Cal. June 25, 2014) (plaintiff's report that another employee had falsified a police report constituted protected activity under § 1102.5 even if plaintiff did not cite a specific law).

Unfortunately for Elzeftawy, though, he has still failed to state a claim under Section 1102.5. As with his retaliation claims under Title VII and § 1981, Elzeftawy has not adequately plead a causal connection between the aforementioned protected activity and Pernix's alleged adverse action against him. But having already marched through this analysis above—in Parts (A)(3)(b)(ii) and (A)(4)—the Court will not repeat it here.

In any event, aside from the failure to adequately plead the elements of retaliation, Count 14 also suffers from the same deficiency as the CFRA and FEHA claims. Namely, there is nothing to suggest that Section 1102.5 permits extraterritorial application, and Elzeftawy has failed to plausibly connect either his place of employment or Pernix's alleged unlawful retaliation to California. *See Oman*, 889 F.3d at 1079 ("[I]f the liability-creating conduct occurs outside of California,

California law generally should not govern ... unless the Legislature explicitly indicates otherwise, which it did not in the Labor Code[].”); *Weinberg v. Valeant Pharmaceuticals Int'l*, 2017 WL 6543822, at *6 (C.D. Cal. Aug. 10, 2017) (on Section 1102.5 claim, plaintiff failed to rebut presumption against extraterritoriality where no retaliatory decision-making occurred in California, and the only work-related connection to California was plaintiff remotely accessing and working with data stored on California computer servers).

For all these reasons, Elzeftawy's Section 1102.5 claim must be dismissed (though without prejudice).

### 3. California False Claims Act (Count 13)

Elzeftawy also brings a retaliation claim under the California False Claims Act (CFCA), Cal. Gov't Code § 12653(a), alleging—as he did in the federal FCA claim—that Pernix retaliated against him for investigating and trying to stop the company's submission of false claims and certifications. Compl. at 73-76. But because Elzeftawy has failed to allege that Pernix submitted false certifications and claims to a *California* governmental entity, Count 13 must be dismissed with prejudice.

In contrast to its federal counterpart (which applies only to false claims submitted to the U.S. government), *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013), the CFCA "is intended to supplement governmental efforts to identify and prosecute fraudulent claims made against *state and local governmental entities*[,]" *John Russo Indus. Sheetmetal, Inc. v. City of Los Angeles Dep't of Airports*, 240 Cal. Rptr. 3d 217, 220-21 (Cal. Ct. App. 2018) (emphasis added) (cleaned up). *See*

70

*also State of California v. Altus Finance*, 116 P.3d 1175, 1182 (Cal. 2005). In other words, the CFCA is limited to false claims presented to the State of California, or to political subdivisions within the state. *John Russo Indus. Sheetmetal, Inc.*, 240 Cal. Rptr. 3d at 221. *See also* Cal. Gov't. Code § 12650(b)(1) (defining "claim" as a request or demand for money from the state or a political subdivision); *State ex rel. Harris v. PricewaterhouseCoopers, LLP*, 141 P.3d 256, 257 (Cal. 2006) ("The [CFCA] provides that any person who knowingly submits a false claim to the State of California, or to a political subdivision, may be liable in a court action for treble damages and civil penalties.") (cleaned up); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1102 n.3 (9th Cir. 2008) ("[T]he CFCA appears limited to false claims submitted to the State of California and might not include … federal Medicare claims … .").

Here, Elzeftawy sues Pernix under Section 12653(a), which protects employees from retaliation for investigating or trying to stop violations of the *CFCA*, not its federal analogue or any other statute. *See* Cal. Gov't Code §12653(a). But nowhere in the Complaint (or in any exhibit or brief for that matter) does Elzeftawy allege that Pernix submitted false claims and certifications to a California governmental entity; instead, Elzeftawy only talks about Pernix's representations to the federal government. *See, e.g.*, Compl. at 11, 16, 27. Given the absence of any facts that Pernix contracted with the State of California or with one of its political subdivisions, Elzeftawy's retaliation claim under the CFCA will be dismissed with prejudice. (Of

course, if appropriate, Elzeftawy may file a motion to reconsider the with-prejudice dismissal.)

### 4. California Unfair Competition Law (Count 19)

Moving to Count 19, Elzeftawy brings a claim under California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq.* "[T]he UCL prohibits, and provides civil remedies for, unfair competition," which it defines broadly as "any unlawful, unfair or fraudulent business act or practice." *Loeffler v. Target Corp.*, 324 P.3d 50, 75 (Cal. 2014) (cleaned up). "By proscribing any unlawful business act or practice, the UCL borrows rules set out in other laws and makes violations of those rules independently actionable." *Zhang v. Superior Court*, 304 P.3d 163, 167 (Cal. 2013) (cleaned up). But "the law does more than just borrow." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999). "The statutory language … makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Id.* Importantly, though, "[w]hile the scope of conduct covered by the UCL is broad, its remedies are limited." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003). Specifically, "[a] UCL action is equitable in nature[,]" *id.*—neither damages nor attorneys' fees can be recovered, *Zhang*, 304 P.3d at 167.

Once again, Pernix raises the presumption against extraterritoriality—which "applies to the UCL in full force[,]" *Sullivan*, 254 P.3d at 198—to argue that Count 19 should be dismissed. But while Pernix is ultimately correct, the question of extraterritoriality in the context of the Unfair Competition Law is more complicated

than when applied to FEHA or to any of the other California statutes discussed above. This is because some California courts "have held that a UCL claim may be brought by a plaintiff who is a resident of California, regardless of where the alleged misconduct occurred." *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 972 (N.D. Cal. 2015) (citing *Norwest Mortgage, Inc. v. Superior Court*, 85 Cal. Rptr. 2d 18, 23 (Cal. Ct. App. 1999), and *Yu v. Signet Bank/Virginia*, 82 Cal. Rptr. 3d 304, 313-14 (Cal. Ct. App. 1999)). A closer look at these decisions, however, reveals that they are distinguishable from the facts in Elzeftawy's case.

For one, although the California residents in *Norwest* could assert their Unfair Competition Law claims regardless of where the misconduct occurred, the California Court of Appeal mentioned this in passing, without any explanation. 85 Cal. Rptr. 2d at 23. Meanwhile, and contrary to the facts here, the defendant in *Norwest* was a company incorporated in California, and the relevant misconduct was directly related to California real estate. *Id.* at 20. So the UCL claim in *Norwest* involved significantly more contacts with California than Elzeftawy's, and on that basis, this Court cannot conclude that *Norwest*'s holding was based solely on the plaintiffs' residency in California.

As for the *Yu* decision, that case too did not engage in any substantive analysis of the extraterritorial reach of the Unfair Competition Law. Rather, in rejecting the argument that "California cannot regulate conduct that is lawful in other states[,]" the court explained that "[i]n the absence of any federal preemption, a defendant *who is subject to jurisdiction in California* and who engages in out-of-state conduct that

73

injures a California resident may be held liable for such conduct in a California court."
*Yu*, 82 Cal. Rptr. 2d at 313 (emphasis added). So *Yu* does not stand for the proposition
that a UCL claim may survive against an out-of-state defendant, based on out-of-
state conduct, *solely* because the plaintiff is a California resident; rather, the
defendant must be subject to personal jurisdiction in California, too. As a general
matter, personal jurisdiction requires a defendant to have made "certain minimum
contacts with [the forum state] such that the maintenance of the suit does not offend
traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*,
326 U.S. 310, 316 (1945) (cleaned up). But at this point, there is nothing in the
Complaint to suggest that Pernix maintained enough "minimum contacts" with the
state of California such that it could have reasonably anticipated being haled into
court there—just the opposite, in fact. *See Walden v. Fiore*, 571 U.S. 277, 284-85
(2014); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). *See also Walden*,
571 U.S. at 285 ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts
with the forum State itself, not … with persons who reside there. … [T]he plaintiff
cannot be the only link between the defendant and the forum."). In short, neither
*Norwest* nor *Yu* stands for the proposition that the UCL automatically applies to *any*
claim brought by a California resident.

Absent a specific controlling case on the UCL, the Court again turns to the
general California principles on extraterritoriality explained above. That is, in
determining whether Elzeftawy's proposed application of the UCL "would cause it to
operate, impermissibly, with respect to occurrences outside" California, *Sullivan*, 254

P.3d at 248, the strength of the connection between the claim and the state of California is vital, *see Ward*, 466 P.3d at 318-319. For his part, Elzeftawy alleges that Pernix violated the UCL by knowingly misrepresenting the applicability of the FMLA in its written employment policies, and by engaging in unlawful conduct under the various federal and state statutes that he invoked in the other counts. Because Elzeftawy alleges essentially the same facts for each count, the Court's analysis on the CFRA and FEHA claims also applies here. That is, Elzeftawy has failed to adequately allege a connection between Pernix's purported conduct and the state of California, so he has proposed an impermissibly extraterritorial application of the UCL. *See, e.g.*, *Sajfr v. BBG Commc'ns, Inc.*, 2012 WL 398991, at *4 (S.D. Cal. Jan. 10, 2012) (where plaintiffs brought California law claims and wrongful conduct was committed abroad by non-residents, "[t]he fact that [p]laintiffs [were] California residents did not change" the court's conclusion that they "impermissibly [sought] to apply California law to extraterritorial conduct.").

But that is not all: even putting aside the issue of extraterritoriality, most of Elzeftawy's Unfair Competition Law claims would need to be dismissed anyway. As previously mentioned, Count 19 is largely premised on the "unlawful" category of UCL liability (based on Pernix's alleged violations of the FMLA, the ADA, Title VII, the FCA, Section 1981, the CFRA, FEHA, the California Labor Code, and the CFCA). *See* Compl. at 95-99; *see also Asencio v. Miller Brewing Co.*, 283 Fed. App'x 559, 561 (9th Cir. 2008) ("[W]here the plaintiff alleges violations of a statute only, the 'cause of action alleges unfair competition that is unlawful rather than unfair or deceptive.'")

(quoting *In re Vaccine Cases*, 36 Cal. Rptr. 3d 80, 93 (Cal. Ct. App. 2005)). But UCL claims for "unlawful" conduct are "incidental to and depend upon the validity (or invalidity) of the preceding claims for relief." *Krantz v. BT Visual Images, L.L.C.*, 107 Cal. Rptr. 209, 219 (Cal. Ct. App. 2001). In other words, the claims cannot survive where the plaintiff has failed to adequately allege violations of the underlying statutes. *Compare, e.g.*, *Candelore v. Tinder, Inc.*, 228 Cal. Rptr. 3d 336, 350-51 (Cal. Ct. App. 2018) ("Because we conclude the complaint adequately states a claim for violation of the Unruh Act, we also conclude the allegations are sufficient to state a claim under the 'unlawful' prong of the UCL."), *with Rubenstein v. The Gap, Inc.*, 222 Cal. Rptr. 3d 397, 406 (Cal. Ct. App. 2017) (where plaintiff failed to state claims under the California False Advertising Law or the Consumers Legal Remedies Act, plaintiff could not "state a cause of action under the 'unlawful prong' of the UCL" premised on either statute). In Elzeftawy's case, this means that even if the UCL *did* apply extraterritorially, most of his UCL claims would still fail, because most of his underlying claims did too. All in all, Count 19 of the Complaint must be dismissed, but without prejudice in the event Elzeftawy can cure the deficiencies discussed above.

One last point: Pernix also argues that Elzeftawy lacks standing to bring the UCL claims. In order to have standing under the UCL, plaintiffs must establish that they "(1) suffered an injury in fact and (2) lost money or property as a result of the unfair competition." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009) (citing Cal. Bus. & Prof. Code § 17204). According to Pernix, Elzeftawy has failed to adequately allege that he lost any money or property (and specifically, that as an at-

will employee, he had no right to a monetary salary from Pernix in the first place). Def.'s Br. at 33-34. But Pernix is wrong. Under the UCL, the economic injury must be enough to constitute an "injury in fact" under Article III of the United States Constitution, meaning that it "must be an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Birdsong*, 590 F.3d at 960 (cleaned up). *See also Kwikset Corp. v. Superior Court*, 246 P.3d 877, 886 (Cal. 2011). This includes situations where the plaintiff was "deprived of money or property to which [they] ha[d] a cognizable claim" or had "a present or future property interest diminished[.]" *Kwikset*, 246 P.3d at 885-86. Considering Elzeftawy's well-pled allegations that he would have been back at work but-for Pernix discriminating against him and denying him a reasonable accommodation, he has plausibly alleged that he has a cognizable claim to a salary from Pernix. So on these facts, Elzeftawy does have standing to pursue his UCL claims—though, of course, unless he amends the Complaint and adequately pleads both the underlying claims and their connection to California, Count 19 will remain dismissed.[23]

### 5. California Common-Law Fraud (Counts 16-18)

In addition to the statutory claims, Elzeftawy brings three claims for fraud under California common law: False Promise (Count 16), Intentional Misrepresentation (Count 17), and Concealment (Count 18). Compl. at 83-95. Pernix

---

[23]Given that Count 19 currently asks for compensatory and special damages, Compl. at 100-101, it is worth clarifying that—although plaintiffs must have suffered economic injury to have *standing* under the UCL—plaintiffs generally cannot *recover* money damages on a UCL claim. *See, e.g.*, *Korea Supply Co.*, 63 P.3d at 943.

argues that *Illinois* law should apply to Elzeftawy's fraud claims, and the Court agrees. Generally, when a federal district court that is sitting in diversity or exercising supplemental jurisdiction has to decide which state's substantive law to apply, the court must apply the forum state's choice-of-law principles—in this case, Illinois. *See McCoy*, 760 F.3d at 684. Illinois law, which "applies the choice-of-law analysis from the Restatement (Second) of Conflict of Laws[,]" *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1049 (7th Cir. 2016), "tells us that the law of the state with the 'most significant relationship to the occurrence and the parties' applies in the event of a conflict[,]" *Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (quoting *Barbara's Sales, Inc. v. Intel Corp.*, 227 Ill. 2d 45, 61 (Ill. 2007)). But the "most significant relationship" test does not come into play unless there is difference in law that would affect the outcome—absent such a disagreement, the law of the forum state applies. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 n.1 (7th Cir. 2009) (citing *Int'l Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985)).

Here, there is no conflict between California and Illinois common-law fraud, so Illinois law would apply. Specifically, all California fraud claims have five basic elements: "'(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" *Grant v. Aurora Loan Servs., Inc.*, 736 F. Supp. 2d 1257, 1270 (C.D. Cal. 2010) (quoting *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003)). Similarly, the five elements of common

law fraud in Illinois are: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). There is no material difference—in either definition or practice—between Illinois and California common law fraud. Because there is no need to determine which state has the "most significant relationship" to Elzeftawy's claims, the law of the forum state (that is, Illinois) applies.

Elzeftawy has adequately pled all three of his fraud claims under Illinois law. He alleges that, in December 2016, while he was recovering in California, Pernix promised him on multiple occasions that he could return to his previous position or to a similar one once his medical leave was over. Compl. at 83-84, 88-89, 93-94. Pernix not only made these same representations to Elzeftawy throughout 2017 (through Watson, Zayed, and McSweeney), but also promised to tell him about any open positions that he might be qualified for. *Id.* Elzeftawy maintains that he relied on Pernix's promises—which were made both orally and in writing—by not seeking other opportunities, and that his reliance was reasonable given his extensive work experience. *Id.* at 85-86, 90. But according to Elzeftawy, Pernix not only failed to follow through, but also actively lied about its intentions to place him in another position and concealed from him the existence of numerous open positions, causing him emotional distress and financial loss. *Id.* at 87, 92, 95. These facts satisfy the

elements of an Illinois fraud claim—that is, that Pernix intentionally made false promises and representations to Elzeftawy regarding his employment status and the availability of open positions; that—in reasonable reliance on Pernix's promises— Elzeftawy did not seek other jobs; and that he was injured as a result. *See Connick*, 675 N.E.2d at 591.

According to Pernix, though, Elzeftawy's claims for common-law fraud fail for lack of particularity no matter which state's law applies. Def.'s Br. at 34-35. Fraud claims brought in federal court—including those brought under state law—are subject to the heightened pleading requirements of Rule 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). So to adequately state a claim for fraud, "a plaintiff ordinarily must describe the who, what, when, where, and how of the fraud … ." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up). In Pernix's view, Elzeftawy's assertions of fraud are too general, failing to identify specific instances when misrepresentations were made, or the place and manner in which they were made. Def.'s Br. at 35.

But Pernix's argument does not hold up. Specifically, Elzeftawy *has* alleged the who (Watson, Zayed, McSweeney); the what (misrepresentations and false promises regarding the existence of open positions and Elzeftawy's ability to return to work, and concealment of intentions and availability of positions); the where (while Elzeftawy was in California, and as may be reasonably inferred, from Pernix

headquarters in Illinois); the when (2017 and December 2016); and the how (orally and in writing). The specificity of these allegations serves the purpose of Rule 9(b): to ensure "that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). No more is required at this point—especially in light of Elzeftawy's extensive allegations in other parts of the Complaint—so Counts 16-18 of the Complaint survive.[24] *See Pirelli*, 631 F.3d at 442 (acknowledging that courts "often erroneously take an overly rigid view of the formulation" and explaining that "the requisite information … may vary on the facts of a given case.").

### 6. California Wrongful Employment Action in Violation of Public Policy (Count 15)

Finally, Elzeftawy alleges a California common law claim for "wrongful adverse employment action in violation of public policy." Compl. at 80-83. In California, "[t]o support such a cause of action, the [public] policy in question must satisfy four requirements: First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be public in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be fundamental and substantial." *Ross v. RagingWire Telecomms., Inc.*, 174 P.3d 200, 208 (Cal. 2008) (cleaned up). The statutory or constitutional provision "must sufficiently describe the type of prohibited conduct to enable an employer to

---

[24]Of course, on summary judgment or later at trial, Elzeftawy will need to show evidence of other employment opportunities that he could have gotten in order to prove his damages.

know the fundamental public policies that are expressed in that law and to have adequate notice of the conduct that will subject the employer to tort liability to the employees it discharges." *Id.* (cleaned up). According to Elzeftawy, Pernix violated California public policy, "as embodied" in the FLMA, ADA, Title VII, Section 1981, FCA, FEHA, CFCA, CFRA, and the California Labor Code. Compl. at 80-82.

Pernix once again makes a choice-of-law argument. As with Counts 16-18 of the Complaint, Illinois law also applies to Count 15, though for different reasons: this time there *is* a conflict between California and Illinois law. Although Illinois recognizes a common-law claim for wrongful discharge in violation of public policy, it is more limited than California's. "Illinois courts decline to extend the tort of wrongful discharge [in violation of public policy] to cases … where statutory remedies already serve as adequate deterrents to the alleged misconduct." *United States v. Cancer Treatment Ctrs. of America*, 2002 WL 31497338, at *3 (N.D. Ill. Nov. 7, 2002) (citing *United States ex rel. Chandler v. Hektoen Inst. for Med. Research*, 35 F. Supp. 2d 1078, 1082 (N.D. Ill. 1999)). *See also Baker v. Miller*, 636 N.E.2d 551, 558-59 (Ill. 1994) (finding that employee covered by Illinois Human Rights Act cannot bring claim for violation of the employment discrimination section of the Illinois Constitution, because the Act is the exclusive remedy for such an action); *Mein v. Masonite Corp.*, 464 N.E.2d 1137, 1139 (Ill. App. Ct. 1984) (holding that plaintiff cannot maintain an action for wrongful discharge for a violation of the policy embodied in the Illinois Human Rights Act, which already "contains a comprehensive series of remedies" for such violations); *More v. Roadway Exp., Inc.*, 1998 WL 292417, at *7 (N.D. Ill. May

19, 1998) ("Where … Illinois provides a statutory remedy for the particular type of misconduct that violates public policy, no independent common law tort is recognized; the person instead must proceed under the statute."). In other words, whereas California allows claims for wrongful discharge in violation of public policy to be predicated on policies expressed in statutes, Illinois generally does not. This is an important enough difference in law to cause a difference in outcomes, *Crichton*, 576 F.3d at 397 n.1, so in order to determine whether California or Illinois law applies, the Court must identify the state with the most significant relationship to the relevant conduct and the parties.

"When applying the most significant relationship test, a court should consider (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered." *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996). Here, some of the injuries—such as Elzeftawy being denied a reasonable accommodation and being effectively terminated—occurred in California, where Elzeftawy is also domiciled. But it is not entirely clear where other injuries—such as McSweeney's alleged harassment— occurred, because the Complaint does not allege a location. On the other hand, the facts point to the injury-causing conduct *originating* in Illinois, where Pernix is headquartered. Likewise, and although the international nature of Elzeftawy's work muddles the question a bit, the facts—as presently alleged—weigh in favor of Illinois as the center of the parties' relationship, given the Court's reasonable inference that the relevant Pernix decision-makers are likely based at headquarters. On balance,

then, Illinois law applies because Illinois has the most significant relationship to Elzeftawy's claims, not California.

Ultimately, this means that Count 15 must be dismissed, because Elzeftawy cannot state an Illinois common-law claim for wrongful discharge predicated on California public policy. This dismissal is without prejudice to allow Elzeftawy to bring an Illinois claim for wrongful discharge in violation of public policy (with the caveat that such a claim must be limited to policies lacking a statutory remedy).

## IV. Conclusion

For the reasons discussed, the Court decides as follows. On the federal claims:

- the FMLA claim (Count 1) is dismissed without prejudice;

- the ADA claims (Count 2) survive, but liability is limited to conduct occurring 300 days before January 30, 2018;

- the Title VII claims (Count 3) for disparate treatment and hostile work environment survive, but liability is limited to conduct that happened on or after June 14, 2017, and the Title VII claim for retaliation is dismissed without prejudice;

- the Section 1981 claims (Count 4) for disparate treatment and hostile work environment survive, and the Section 1981 claim for retaliation is dismissed without prejudice; and

- the U.S. False Claims Act claim (Count 5) is dismissed without prejudice.

On the state-law claims:

- the CFRA and FEHA claims (Counts 6-11) are dismissed without prejudice;

- the claims under Sections 6310 and 6400 of California Labor Code (Count 12) are dismissed without prejudice;

- the claim under Section 1102.5 of the California Labor Code (Count 14) is dismissed without prejudice;

- the California False Claims Act claim (Count 13) is dismissed with prejudice;

- the Unfair Competition Law claim (Count 19) is dismissed without prejudice;

- the common-law fraud claims (Counts 16-18) survive; and

- the claim for wrongful adverse employment action in violation of California public policy is dismissed without prejudice (Count 15).

For the dismissals that are without prejudice, Elzeftawy may file an amended complaint to fix (if possible) the deficiencies identified in this Opinion by August 24, 2020. Otherwise, those dismissals will convert to a with-prejudice dismissal. The Court urges Elzeftawy to bear in mind the warnings against unnecessary complexity in any amended pleading and in the case overall.

The status hearing of August 21, 2020 is reset to September 11, 2020, at 8:30 a.m. (but just to track the case, the case will not be called). By August 28, 2020, the parties shall file a joint status report, R. 5, proposing a discovery schedule for the surviving claims. Because there might be an amended complaint, and in light of the sheer prolixity of the current complaint, the Court will not require (yet) a partial answer to the surviving claims. But discovery must get going on the surviving claims. The Mandatory Initial Discovery standing order does apply to this case, and the parties shall use (in proposing the discovery schedule) an MID disclosure date of

September 8, 2020 (even if an amended complaint is filed) on the surviving claims and move on from there.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 8, 2020